John C. DOUGHERTY, Plaintiff,

v.

CAPITOL CITIES COMMUNICATIONS, INC., and WJR Detroit, a division of Capital Cities, Inc., Defendants.

No. 81–73981.

United States District Court, E.D. Michigan, S.D.

Feb. 6, 1986.

Charfoos, Christensen, Gilbert & Archer, P.C. by Lawrence S. Charfoos, Detroit, Mich., for plaintiff.

Miller, Canfield, Paddock & Stone by Gregory L. Curtner, Detroit, Mich., for defendants.

## OPINION

GILMORE, District Judge.

In a society which takes seriously the principle that government rests upon the consent of the governed, freedom of the press must be the most cherished tenet. It is elementary that a democracy cannot long survive unless the people are provided with the information needed to form judgments on issues that affect their ability to intelligently govern themselves.[1]

Defendants' motion for summary judgment and dismissal in this diversity case raises fundamental issues of the right of a free press to report matters of public interest. It is a defamation action arising out of a four-part series of radio broadcasts by radio station WJR of Detroit, through its reporters Ron Hansen and Gene Fogel, dealing with alleged problems and improprieties in the Bankruptcy Court for the Eastern District of Michigan. Nine of the 23 three-minute programs aired between February 23 and July 12, 1981 mentioned the plaintiff, John Dougherty, and are the subject matter of this lawsuit. Portions of the transcripts of these broadcasts referring to the plaintiff are attached to this opinion as Appendix A.[2]

By early 1981, following an initial investigation by the Administrative Office of the United States Courts, the United States Attorney's Office and the FBI were conducting a criminal investigation of the Bankruptcy Court in Detroit. It is against this backdrop that WJR commenced its own investigation into the court, resulting in the series of 23 broadcasts.

The upheaval in the Bankruptcy Court system did not end with the federal investigation. In May 1981, the Judicial Council of the Sixth Circuit Court of Appeals placed the Bankruptcy Court in receivership under the supervision of Chief Judge John Feikens of this District. Prior to that, in January 1981, the Circuit Executive had appointed a Merit Screening Committee to consider the reappointment of Bankruptcy Judge Harry Hackett. In its report to Chief Judge George Edwards of the Court of Appeals, the Committee commented that the WJR broadcasts "raise[d] many of the same allegations of conduct on

---

1. *Edwards v. National Audubon Society,* 556 F.2d 113, 115 (2d Cir.) *cert. denied sub nom. Edwards v. New York Times,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

2. These include the broadcasts of (1) February 24, 1981 (1st series, News File # 2); (2) February 27, 1981 (1st series, News File # 5); (3) March 2, 1981 (1st Series, News File # 6); (4) March 4, 1981 (1st Series, News File # 8); (5) April 22, 1981 (2nd Series, News File # 3); (6) April 23, 1981 (2nd Series, News File # 4); (7) May 11, 1981 (3rd Series, Program 1); (8) May 12, 1981 (3rd Series, Program 2); and (9) July 8, 1981 (4th Series, Program 3).

the part of Judge Hackett which are raised in the report." The Committee recommended that the Chief Judge find Judge Hackett not qualified to remain in office after the expiration of his term. Shortly after Chief Judge Edwards found Judge Hackett unqualified to remain in office as a bankruptcy judge for the Eastern District of Michigan past the June 1981 expiration of his term, Judge Hackett resigned from office.

In addition, several criminal prosecutions occurred. Irving August, a bankruptcy attorney, and his female companion, Kathy Bogoff, the intake clerk of the Bankruptcy Court, were convicted of obstruction of justice and conspiracy to defraud the United States Government for their roles in manipulating the blind draw system of the Bankruptcy Court. William Harper, the former clerk of the Bankruptcy Court, was convicted of purchasing property from a bankrupt estate while a court officer. WJR reporters Hansen and Fogel testified at Harper's trial.

During this period, plaintiff John Dougherty, pursuant to appointment from the Bankruptcy Court, served as a standing trustee for the Chapter 13 cases in this District, as well as being a member of the Chapter 7 Panel of Trustees. Plaintiff filed this suit in October 1981 alleging libel and slander, disparagement, invasion of privacy, and intentional infliction of emotional distress. Defendants have filed a motion to dismiss or for summary judgment as to all claims.

Initially, defendants contend that, as to most of the broadcasts, plaintiff has failed to present a prima facie case because many of the sections of the broadcast were either undisputedly true or were not of or concerning the plaintiff, and therefore not actionable as defamation.

In addition, defendants claim several privileges of both common law and First Amendment origins protecting the broadcasts. They assert the *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), qualified privilege, arguing that plaintiff, as a standing Chapter 13 Trustee and a member of the Chapter 7

Panel of Trustees, was a public official. As such, defendants argue, plaintiff must establish a question of material fact with clear and convincing evidence of actual malice in order to defeat defendants' privilege.

Defendants also claim that much of the suspect broadcasts were statements of opinion, not of fact, and therefore enjoy an absolute privilege under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In addition, they claim that any alleged innuendo is just another form of opinion and, therefore, also absolutely privileged. They also claim a Michigan statutory privilege to report on judicial proceedings under M.C.L.A. § 600.2911(3).

Finally, defendants claim a Michigan common law qualified privilege to report on matters of public interest, which can only be overcome by proof of actual malice.

Plaintiff, on the other hand, claims that defamatory statements were made of and concerning him, some of which were defamatory *per se* because they intended to impute a crime, and others injured him in his profession as an attorney.

Plaintiff also argues that he is not a public official under *New York Times v. Sullivan, supra,* because he is a private bankruptcy attorney, and, although he served as a trustee, he did not have substantial responsibility for conducting public governmental affairs. He denies that Michigan statutory qualified privilege to report on judicial proceedings is applicable, claiming that that privilege only covers fair and correct reports of the proceedings, and that in many respects the reports were not fair and correct. He further denies the applicability of the Michigan common law qualified privilege to report on matters of public interest because, he claims, these statements were not made on an occasion warranting application of the privilege.

In considering defendants' motion, it is important to keep in mind that, although the Sixth Circuit has rejected the argument that summary procedures are especially favored in defamation cases involving media defendants, *Clark v. American Broadcast-*

*ing Co., Inc.,* 684 F.2d 1208, 1212 (6th Cir.1982), it is also true that summary disposition is not particularly disfavored in this area. *Id.* In short, the usual standard from Fed.R.Civ.P. 56(c) applies: summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Bichler v. Union Bank & Trust Co. of Grand Rapids,* 745 F.2d 1006, 1013 (6th Cir.1984).

In the interest of avoiding unnecessary constitutional determinations, this Court will first consider defendants' state law arguments. Of course, in so doing, the Court is mindful of the fact that "state laws relating to defamation have been necessarily affected by First Amendment principles, and in some respects have been 'subsumed in' constitutional holdings." *Schultz v. Newsweek, Inc.,* 668 F.2d 911, 916 (6th Cir.1982).

An action for defamation does not lie unless, among other factors, the alleged defamatory statements are false and are of and concerning the plaintiff. *Hall v. Citizens Insurance Company of America,* 141 Mich.App. 676, 685, 368 N.W.2d 250 (1985); *Postill v. Booth Newspapers, Inc.,* 118 Mich.App. 608, 618, 325 N.W.2d 511 (1982). Thus, where there is no question of material fact presented as to the truth of the statements made by the broadcast reporters, or where the reports were not "of and concerning plaintiff", no defamation action lies.

■ Here, plaintiff has been unable to point to a single specific statement that was "of and concerning him", defamatory, or untrue. Although plaintiff painstakingly presents his version of the story behind each of the broadcasts in his appendix A to his response to defendants' motion, he does not succeed in uncovering any significant statement about him that is false.

Plaintiff's stronger argument is that, although each of the statements, taken alone, is true, it was the overall tone of the broadcasts that is defamatory, and that this is the result of innuendo from that which was *not* stated in the broadcasts.

Taking plaintiff's argument as true for the purpose of this motion, it raises the question of the applicability of the Michigan common law qualified privilege to report on matters in the public interest, which insulates a defendant from liability absent a showing of actual malice.

Michigan courts have repeatedly held that a qualified privilege exists to report on matters of public interest. *See Bacon v. Mich. Central R.R. Co.,* 66 Mich. 166, 170, 33 N.W. 181 (1887); *Bolton v. Walker,* 197 Mich. 699, 706–07, 164 N.W. 420 (1917); *Lawrence v. Fox,* 357 Mich. 134, 137, 97 N.W.2d 719 (1959); *Bufalino v. Maxon Bros.,* 368 Mich. 140, 117 N.W.2d 150 (1962).[3]

In *Bostetter v. Kirsch Co.,* 319 Mich. 547, 30 N.W.2d 276 (1978), the court held that a qualified privilege extends to all communications made in good faith upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. It embraces cases where the duty is not a legal one, but is of a moral or social character of imperfect obligation.

In that case, the plaintiff sued to recover damages claimed to have been sustained as a result of the publication by defendant of an allegedly libelous article printed in the Sturgis Daily Journal. The court determined as a matter of law that the defendant had a qualified privilege, holding that in such a case the plaintiff must prove both the falsity of the charge and malice. It said:

> Under the principles recognized by the foregoing authorities ... the statement published by defendant was qualifiedly privileged. Unquestionably, it had an in-

---

**3.** This privilege is not mandated by the First Amendment, as the United States Supreme Court has left the states free to define the scope of their defamation laws where private figure plaintiffs are involved, providing only that liability cannot be imposed on media defendants without fault, and that punitive damages cannot be imposed absent *New York Times* malice. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974).

terest in the subject matter of the controversy that was going on in the City concerning the reopening of Prospect Street and the repayment to defendant of part of the money deposited by it in 1942. The people of the City were also concerned, and materially so, in both issues under discussion. Under such circumstances, defendant was entitled to publish the facts as claimed by it in good faith. Defendant was not liable to plaintiff on the theory it was liable unless it made the publication with malice.

*Id.* at 559, 30 N.W.2d 276.

Plaintiff argues that the Michigan qualified privilege does not apply to situations such as this one where the plaintiff is not a public official, relying on *Lawrence v. Fox, supra.* However, the Sixth Circuit has expressly held that under Michigan law "[n]ewspapers and broadcasters have a qualified privilege to report on matters of public interest and the privilege applies equally in actions brought by public and private persons," citing *Lawrence; Peisner v. Detroit Free Press*, 82 Mich.App. 153, 160, 266 N.W.2d 693 (1978), reversed on other grounds, 421 Mich. 125, 364 N.W.2d 600 (1984); *Weeren v. Evening News Assoc.*, 2 Mich.App. 74, 77, 138 N.W.2d 526 (1965). *Bichler v. Union Bank & Trust Co. of Grand Rapids, supra*, at 1011.

Plaintiff also argues that *Rouch v. Enquirer & News of Battle Creek Michigan*, 137 Mich.App. 39, 357 N.W.2d 794 (1984), distinguishes between "matters which truly promote the public interest and matters which are merely interesting to the public," *id* at 51, 357 N.W.2d 794, and that the instant case is in the latter category and therefore not within the privilege. The trial court in *Rouch* granted summary judgment for the defendant newspaper that reported the plaintiff's arrest for rape, together with some of the details of the crime. The plaintiff was not formally charged, and another person was eventually arrested. Summary judgment was based in part on Michigan's qualified privilege, and the Michigan Court of Appeals reversed, stating:

Under the Restatement formulation, media defendants enjoy a qualified privilege to report on matters which advance an important societal or public interest, not a qualified privilege to report on every matter which may be of interest to the public.... A privilege extends only so far as the reason for it applies ... In other words a matter is not necessarily privileged merely because it in some way relates to the public interest. (citations omitted)

*Id.* at 51–2, 357 N.W.2d 794.

The Court went on to note that the privilege applied to matters "deserving of robust public debate" and not matters "generally interesting" to the public. *Id.* at 58, 357 N.W.2d 794. *Rouch* was cited with approval in *Nabkey v. Booth Newspapers*, 140 Mich.App. 507, 510–13, 364 N.W.2d 363 (1985), in which the defendant had published an article stating that the plaintiff had been arrested for theft of court records and assault.

Defendants argue that *Rouch* and *Nabkey* are not persuasive precedent since they are contrary to other decisions on this issue, *Gaynes v. Allen*, 128 Mich.App. 42, 49, 339 N.W.2d 678 (1983); *Peisner v. Detroit Free Press, Inc.*, 82 Mich.App. 153, 161, 266 N.W.2d 693 (1978), reversed on other grounds, 421 Mich. 125 (1984); *Schultz v. Newsweek, Inc.*, 668 F.2d 911, 914 (6th Cir. 1982); *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1113 (6th Cir.1978). They point out that in *Bichler, supra*, the Sixth Circuit stated the issue in broader terms: "The proper test is whether it *deals with matters of public interest*," finding that the personal finances of a dinner-theater's manager were privileged when reported on in a story about the closing of the theater. *Id.* at 1011 (emphasis added).

Since the Michigan Court of Appeals decision in *Rouch*, the Michigan Supreme Court has granted leave to appeal that case, 422 Mich. 934 (June 26, 1985), and stayed decision on an application for leave to appeal in *Nabkey* pending the decision in *Rouch* on Aug. 28, 1985. In addition, another panel of the Michigan Court of Appeals has criticized *Rouch*:

We are not convinced that the distinction referred to in the quoted statement is fully supported by the cases cited in *Rouch*. In fact, this formulation seems to be in conflict with the Supreme Court's broad view of the qualified privilege, as enunciated in *Lawrence, supra*. Reports of criminal charges and accusations are indeed matters in the public interest. If *Rouch* does apply, we are satisfied that publication does promote the public interest. This was not a gossip column article. Consequently, we decline to find that *Rouch* defeats defendants' qualified privilege to publish the article that is the subject of this case.

*Kurz v. The Evening News Assoc'n*, 144 Mich.App. 205, 212, 375 N.W.2d 391 (1985).

This Court finds defendants' argument convincing, and holds that the correct approach under Michigan law is the broad view of the qualified privilege to report on matters in the public interest. Under this broad view of the qualified privilege, it is clearly applicable to this case, so that plaintiff must show malice on the part of defendants.

Furthermore, even if the *Rouch* approach is adopted by the Michigan Supreme Court, this Court finds that the instant case would still fall within the broader view of the privilege. Even under *Rouch*, these reports were more than "merely interesting to the public," they were "matters deserving of robust public debate," and thus within the scope of the privilege.

It is undisputed that the subject matter of the series of 23 broadcasts by WJR focused upon purported irregularities in the functioning of the Bankruptcy Court and the interrelationships of its judges, the attorneys and court employees. Each and every broadcast began with the same introduction:

NEWSFILE: A BANKRUPT COURT. I'M [ROD HANSEN OR GENE FOGEL], WJR NEWS, WITH A SERIES OF REPORTS ON THE UNUSUAL WAYS THE SCALES OF JUSTICE ARE BALANCED IN DETROIT'S FEDERAL BANKRUPTCY COURT.

To argue that broadcasts addressing alleged improprieties in the Bankruptcy Court are not in the public interest stretches the limits of logic. In the debate on the Bankruptcy Reform Act of 1978, Congress expressed its concern over differing aspects of the functioning of the system:

The practice in bankruptcy is different for several reasons. First, there is a public interest in the proper administration of bankruptcy cases. Bankruptcy is an area where there exists a significant potential for fraud, for self-dealing, and for diversion of funds. In contrast to general civil litigation, where cases affect only two or a few parties at most, bankruptcy cases may affect hundreds of scattered and ill-represented creditors. In general civil litigation, a default by one party is relatively insignificant, and though judges do attempt to protect parties' rights, they need not be active participants in the case for the protection of the public interest in seeing disputes fairly resolved. In bankruptcy cases, however, active supervision is essential. Bankruptcy affects too many people to allow it to proceed untended by an impartial supervisor. (Footnotes omitted.)

H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 88 *reprinted in* U.S.Code Cong. & Ad. News 1978, 5787, 6050.

* * * Thus, litigants and observers frequently object to the apparent, and in many cases real, cronyism between bankruptcy judges and their trustees. The "bankruptcy ring" is reflected not only in the appearance of unfairness in bankruptcy judges' rulings in litigation between their appointees and third parties, but also in the awarding of compensation by the appointing authority.

\* \* \* \* \* \*

There is an unusually close relationship between the bankruptcy judges and the bankruptcy bar, especially the debtors' and trustees' bars. They are in frequent contact with the judge as a result of the necessity for the judge's review of administrative actions of the trustee or

debtor in possession. Usually, a trustee is appointed by the bankruptcy judge, and is appointed in numerous cases before the same judge. Debtors' attorneys make frequent appearances in the same court representing numerous different debtors. All of these contacts and relationships have led to a feeling among non bankruptcy practitioners that there is a "bankruptcy ring" that has an inside track on all bankruptcy matters, including the judges' favoritism.

*Id.* at 95, reprinted at 6056.

Thus, legislative history clearly indicates that Congress considered the necessity to avoid even the appearance of impropriety in the operations of the bankruptcy court system an important matter, and one in the public interest. It is just this appearance of impropriety and concern for the administration of justice that the broadcasts in issue address. The free expression of views portrayed in the broadcasts demonstrates the checking value of speech designed to prevent breach of the public trust and abuses of public power. Blasi, *The Checking Value in First Amendment Theory*, 1977 American Bar Foundation Research Journal, at pp. 527 & 584.

Neither plaintiff's claimed status as a private figure nor a claim that he was not the focus of the matter in the public interest warrants a different result.[4] *Bichler*, 745 F.2d at 1011, 1012. "There is no requirement under Michigan law that the plaintiff be the 'focus' of the publication in order for the privilege to attach". *Schultz*, 668 F.2d at 915 and 918.

Applying Michigan law, this Court concludes that the broadcasts at issue in this case presented an occasion for application of the qualified privilege to report on matters in the public interest.

Although plaintiff argues that application of the qualified privilege requires him to prove only common law malice, i.e. ill will or spite, the majority of Michigan appellate courts and federal decisions addressing the issue require proof of the *New York Times* standard of actual malice. *See*

*Bichler v. Union Bank & Trust Co.*, 745 F.2d at 1013; *Schultz v. Newsweek*, 668 F.2d at 918; *Dienes v. Associated Newspapers, Inc.*, 137 Mich.App. 272, 278, 358 N.W.2d 562 (1984); *Lins v. Evening News Association*, 129 Mich.App. 419, 434, 342 N.W.2d 573 (1983). *But see Postill v. Booth Newspapers, Inc.*, 118 Mich.App. 608, 619–20, 325 N.W.2d 511 (1982). Furthermore, in *Peisner v. Detroit Free Press*, 421 Mich. 125, 137 n. 12, 364 N.W.2d 600 (1984), the Michigan Supreme Court expressed its approval of cases applying the *New York Times* actual malice standard while reserving the common law malice standard for claims of exemplary and punitive damages. Accordingly, where the Michigan's highest court has indicated its preference, this Court concludes that, in order to defeat the qualified privilege that protects defendants' broadcasts, plaintiff must offer proof that defendants aired their broadcasts with actual malice.

This actual malice standard requires plaintiff to prove that defendants broadcast a defamatory falsehood "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726. Reckless disregard is a subjective standard not to be measured by the conduct of a reasonably prudent person, but rather requires sufficient proof "that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511, n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502, 524 n. 30 (1984); *Gertz*, 418 U.S. at 334–35 n. 6, 94 S.Ct. at 3004–05 n. 6.

In summary, under Michigan law members of the news media have a qualified privilege to pass along to the public information concerning a matter of public interest, particularly that involving the public welfare and the welfare of courts, even if the material turns out to be defamatory.

---

**4.** As it is not necessary for the disposition of this motion, this Court makes no determination as to whether plaintiff was a private figure or whether he was a focus of the broadcasts.

When a newspaper, radio or television station in good faith publishes information directly concerning such a matter, the publication is protected by a qualified privilege. The publisher is free from liability for libel or invasion of privacy, absent malice on his part. To overcome that privilege, the person claiming defamation has the burden of proving the publisher acted with actual malice. In the law, actual malice means the publisher knew the publication was false, or published it with reckless disregard for its truth or falsity, or that the publisher did so with ill will and a desire or intent to injure the plaintiff.

Defendants have submitted affidavits and depositions of several persons, including the two reporters, Rod Hansen and Gene Fogel. This evidence demonstrates that the reports were published with a good faith belief in the truth of their contents. In addition, defendants have submitted a partial list of 44 persons relied upon as sources in their broadcast series. Further evidence indicates that at one point reporter Rod Hansen tried to question the plaintiff, Dougherty, about the receipt of furniture from liquidator Tebo at the Michigan Sofabed store. Dougherty admitted that he falsely denied knowledge of Michigan Sofa, and then asked that all questions be submitted in writing, but failed to answer them on "advice of counsel."

Actual malice need not be proven directly but may be shown by inference from objective facts. *Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979). Still, a plaintiff must offer objective evidence that the defendant published knowing the report was false, or that defendant subjectively had serious doubts about its truth. *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. Plaintiff offers many circumstances that he claims infer actual malice on the part of the defendants, but most of these circumstances are immaterial to the issue of libel of plaintiff because either they are not about statements of or concerning plaintiff, or they do not relate to alleged false statements, or they do not demonstrate any subjective serious doubt by defendants as to the truth of the statements.

For example, plaintiff argues that he had told defendants he had not given any money for airfare to Atlanta to Sharon Hughes. He contends that defendants' conduct in ignoring this warning that the broadcast was inaccurate is evidence from which malice can be inferred. The Court concludes, however, that this evidence is insufficient to raise a material question of fact as to defendants' actual malice. First, defendants did not ignore the warning by trying to conceal it. Although it was not included in the February 27, 1981 broadcast, the broadcast of April 22, 1981 contains a statement of Dougherty's denial. The later broadcast's mention of the denial negates any inference that it was ignored or concealed.

Second, plaintiff's denial of a fact is insufficient to infer malice. As stated by the Second Circuit in *Edwards v. National Audubon Society*, 556 F.2d 113, 121 (2d Cir), *cert. denied sub nom. Edwards v. New York Times*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." In addition, the surrounding circumstances indicate that it was reasonable to believe the Hughes' version. As the reporters' affidavits attest, many of Hughes' statements were confirmed by other sources, while Dougherty had initially withheld the fact that he had paid for her hotel room by stating "he was not involved in any third-party gratuities of any kind." When viewed against these undisputed facts, plaintiff's warning that Hughes had lied does not raise a material question of fact as to actual malice.

Next, plaintiff relies on a deposition statement by bankruptcy attorney Stanley Bershad that reporter Hansen did not heed his warning that only one of three Michigan Sofabed stores was in bankruptcy and that a sofabed Bershad had received was payment from a non-bankrupt store for fees in a non-bankruptcy matter. This is in connection with the May 12, 1981 broadcast. As these allegations relate only to

statements about attorney Bershad and the liquidator, David Tebo, they are not "of and concerning plaintiff," and therefore do not involve broadcast of statements defamatory to plaintiff.[5] Accordingly, Bershad's deposition testimony does not raise a material question of fact as to any defendants' actual malice in the alleged defamation of plaintiff.

■ Plaintiff next claims that reporter Fogel's remark that a gap of two minutes between the time stamp for the filing of a fee justification and the resultant order did not allow time for argument is a fabrication indicative of actual malice. Plaintiff cites this section of the broadcast as illustrative of defendants' poor working knowledge of the Court since, in fact, a hearing had previously occurred. Accepting as true, for the purposes of this motion only, plaintiff's contention that Fogel was in error in his analysis of the significance of the time stamp difference on the two filings, defendant's mistake "does not evidence a doubtful mind on his part." *St. Amant,* 390 U.S. at 733, 88 S.Ct. at 1326.

■ Next, plaintiff alleges that actual malice can be inferred because defendants disregarded evidence by those likely to know the truth. Plaintiff details seven alleged examples, all situations in which plaintiff claims that omission of facts constitutes actual malice. Generally, however, the omission of known facts from what is eventually published is not indicative of actual malice. *Brasslett v. Cota,* 761 F.2d 827, 843 (1st Cir.1985).

Plaintiff objects first to defendants' April 22 and April 23, 1981 broadcasts, which indicate that Judge Hackett appointed Dougherty as co-receiver in the Pioneer Engineering bankruptcy action shortly after Dougherty's trip to Atlanta with Judge Hackett. Plaintiff says reporter Fogel's notes reveal he knew Judge Hackett's order followed a motion by then-receiver Borock. The reporter's notes cannot be construed as evidence of actual malice where it is undisputed that Judge Hackett did appoint Dougherty co-receiver shortly after the Atlanta trip. Where the stated facts are true, plaintiff cannot argue that these facts support an inference that defendants had serious doubts as to their truth.

Similarly, Fogel's notes reflecting his interview with Dougherty, which include Dougherty's claim that he did not attend the judicial conference with Judge Hackett, do not raise an inference of malice in the broadcasts of February 27 and April 22, 1981.

The applicable section of the February 27, 1981 broadcast states:

... Last March, [Judge Hackett] motored to Atlanta to attend a judicial seminar, taking with him attorney John Dougherty. Some judicial conferences are open to attorney's [sic] on a pay your own way basis, but this was not such an occasion. It was for bankruptcy judges only.

The section of the April 22, 1981 broadcast at issue states:

It should be recalled that the second receiver overseeing Pioneer Engineering, John Dougherty, got attention in our previous newsfile series. He's the man who took his girlfriend on a March, 1979, trip to Atlanta with Judge Hackett for a judicial seminar to which attorneys were not invited.

The broadcasts nowhere state that Dougherty actually attended the judicial conference. Instead, the two broadcasts state only the uncontested facts that Judge Hackett attended a judicial conference in Atlanta, that lawyers were not invited to the conference, and that Dougherty accompanied Judge Hackett on the Atlanta trip. Fogel's notes, therefore, are not evidence sufficient to support an inference of malice as they do not demonstrate that defendant entertained serious doubts as to the broadcast facts.

Plaintiff also alleges evidence of actual malice relative to statements in the March 4, 1982 broadcast:

Bankruptcy Court is a web of entanglements, some of which push the limits of propriety. For instance John Dougherty

---

5. See discussion, *supra,* p. 1569.

is the standing trustee for all Chapter Thirteen cases filed in Michigan's Eastern District. Judge David Patton is the Presiding Judge in all Chapter Thirteens. Yet, Dougherty has reportedly provided gifts, other favors and companionship for Patton's secretary. At the same time, Dougherty's law partner is engaged to marry Hackett's secretary. The women, as a matter of course, have access to the confidential files of the Judges.

Several observers have questioned the arrangement, saying it makes it conceivable for lawyers to learn such things as how a judge is leaning in a case. Armed with that information, an attorney could change his own tactics—in essence altering his client's fate after it had been sealed.

Plaintiff argues that Fogel's notes that reflect Judge Patton's comments that "he doesn't see that an attorney would have an unfair advantage in having access to files" and "he doesn't feel that lawyer would benefit from relationship" are evidence to support an inference that defendants had serious doubts about the truth of the statements.

Plaintiff does not seriously question the truth of the facts stated in the first paragraph.[6] Instead, he argues that Judge Patton's comments to Fogel support an inference that the reporter's conclusion that a lawyer might gain a tactical advantage in knowing a judge's predisposition in a case was made with actual malice.[7] Even if such an inference can be drawn, this conclusion is an opinion and not a statement of fact.[8] Furthermore, this opinion is supported by the deposition testimony of Judge Pettigrew, Judge Brody and David Sherwood, then Acting Clerk and presently Bankruptcy Clerk of the Court. Defendants' publication of a reasonable *opinion* shared by others does not present a materi-

al question of *fact* as to whether defendants published with actual malice.

Plaintiff also contests defendant's statement in the April 23, 1981 broadcast that Dougherty and his co-receiver had requested fees of $100,000 without time sheets detailing their work hours. Plaintiff does not contest the truth of this statement, but argues it "implies" that time sheets are required, whereas Judge Patton and Creditors' Committee lawyer Alan Gilbert had told the reporter the Act did not require time sheets. Defendant did not state that time sheets were required. Furthermore, plaintiff's Exhibit A13 of the transcript of the January 24, 1981 hearing on the fee petition clearly indicates that Judge Hackett specifically requested Dougherty to furnish time sheets:

> Mr. Dougherty you tell me your petition I see no—you tell me there has been some eight hundred hours. You don't give me a period of times when the eight hundred hours were spent. I would like to have some idea and further, I will require that—there are no attached schedules here of hours spent, and I need that. I will have to have that. I would like for you to file with me, and the quicker I get it, the quicker I can determine the matter, a schedule of your hours here, time spent and the hours spent specifically for the period for which you are asking compensation.

This Court concludes the undisputed facts do not support plaintiff's contention that the reporter's reference to a lack of time sheets raises a material question of fact as to actual malice.

Plaintiff's allegations as to the known inaccuracies in the May 11, 1981 report on the Sterling Fireplace matter are immaterial and are not evidence of actual malice towards Dougherty as they involve matters

---

**6.** Plaintiff does note that it was his employee and not his partner who was engaged to Judge Hackett's secretary.

**7.** At his deposition, Judge Patton conceded that, if he had known about the gift-giving, he would have been concerned about the ethical or legal propriety of the relationship.

**8.** "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (Footnotes omitted.) *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).

that were not of and concerning plaintiff. Defendant's statement that a firm offer by creditors to purchase Sterling never reached the Court concerns a period of time that the report makes clear predates Dougherty's involvement in the case by at least six months.

Similarly, plaintiff's reliance on alleged inaccuracies in the details of Tebo's purchase of the inventory of Michigan Sofa is without merit as these inaccuracies pertain to Tebo's purchase and are therefore not of and concerning plaintiff. The report stated that the company's inventory was sold to Tebo to satisfy the claim of the National Bank of Detroit, a secured creditor. Plaintiff alleges that, in actuality, Tebo purchased directly from the National Bank of Detroit as secured creditor. Accepting the allegation as true, it is not evidence of actual malice as it is neither material nor of and concerning plaintiff.

■ In analyzing plaintiff's contentions, accepting his pleadings and arguments in the most favorable light, it is impossible to discern any false information in the broadcasts. Each statement made had a factual basis, and where they were not factual statements, as with the potential tactical advantage in knowing the judge's predisposition in a matter, they were statements of opinion that were not actionable as defamation. On this ground alone, this action could be dismissed. Furthermore, however, even if plaintiff could raise some question as to truthfulness based on innuendo and omission from these reports, the Court finds that summary judgment can be based on Michigan's qualified privilege to report on matters in the public interest, as plaintiff cannot raise any issue of material fact on the question of defendants' actual malice.

Since the Michigan common law privilege provides a complete defense to the defamation claim, there is no need to consider defendants' federal constitutional argument that *New York Times v. Sullivan, supra,* applies here because this plaintiff is a public official.

■ As for plaintiff's other claims for disparagement, invasion of privacy and in-

tentional infliction of emotional distress, the privileges applicable to the defamation claim would apply to the first two. *Bichler, supra,* at 1011. Since this Court holds that defendants were reporting on important matters of legitimate public interest, and did so without actual malice, their conduct cannot be said to have been so extreme and outrageous as to shock the public conscience, as is required for intentional infliction of emotional distress. *See, e.g. Ross v. Burns,* 612 F.2d 271 (6th Cir. 1980); *Fry v. Ionia Sentinel-Standard,* 101 Mich.App. 725, 300 N.W.2d 687 (1980). Furthermore, as for the claim of invasion of privacy, the allegations of intrusion upon solitude resulting from defendants' contacts with plaintiff's girlfriends would give a cause of action, if at all, to the two women rather than to plaintiff.

Therefore, defendants' motion for summary judgment is granted in full, and the case will be dismissed. Defendants may tax costs.

### APPENDIX A

1. Broadcast of February 24, 1981 by Rod Hansen of WJR Radio.

It also is no secret that special relationships exist between two, and quite possibly all three bankruptcy judges, some court employees, some lawyers and some trustees. Even if there is no hard evidence of illegality, there are tough questions hanging in the fire about judicial ethics and propriety....

... Each judge, court employee, lawyer and trustee interviewed strenuously denied that he or she had breached ethics or propriety.

· · · · ·

Two of the judges have maintained closer than casual relationships with lawyers practicing in the Bankruptcy Court. One shared a business trip to Atlanta with one and a pleasure trip to Toronto with another in the past 18 months. The other judge vacationed in Mexico and attended a judicial conference in Hawaii with the same attorney-trustee who accompanied the other judge to Atlanta.

At least three female employees of Bankruptcy Court have been given money, trips and other favors by the same two travelling lawyers....

One of the attorneys we've mentioned is John Dougherty, who has been appointed by the three-judge bench to handle all Chapter 13 bankruptcy petitions. The Bankruptcy Code calls for such an appointment. In Dougherty's case it's worth an estimated $46–$50,000 a year.

2. Broadcast of February 27, 1981 by Rod Hansen.

But Canons, Codes and appearances notwithstanding, Judge Hackett's trip-sharing was not limited to August. Last March, he motored to Atlanta to attend a judicial seminar, taking with him attorney John Dougherty. Some judicial conferences are open to attorneys on a pay-your-own-way basis, but this was not such an occasion. It was for bankruptcy judges only.

Some of the things that went on relating to the Atlanta trip are also questionable. There was the presence of Dougherty's girl friend in the party. More importantly there was the appearance on the scene of a court employee who, according to a variety of sources, was at the time the object of Judge Hackett's attention. Although lawyer and judge say each paid his own way for the conference, the expenses of the employee are another matter.

Dougherty and Hackett say they did not know she was coming, that she just "showed up." Others remember it quite differently. They insist the judge invited her, and she claims the judge told her Dougherty would take care of her expenses. In fact, the fly-in guest says she could not afford a trip to Atlanta, and Dougherty handed her $300 before he left with Judge Hackett....

Dougherty reportedly also picked up the tab for the court employee's hotel bill....

3. March 2, 1981, by Gene Fogel.

Questions have been raised about Judicial and Bar Codes of Conduct and how they apply to relationships, including out-of-town trips, involving Senior Judge Harry Hackett, lawyers Irving August and John Dougherty—and female court employees who went along.

... Later, Brody [Judge George Brody of the Bankruptcy Court], a bachelor, acknowledged that last winter he and an out-of-state female companion vacationed on Cozumel Island, Mexico, with attorney Dougherty and his girlfriend. Even though he recently offered evidence that he had consulted two federal district judges in advance, had paid the bills of himself and his companion, Judge Brody now feels the trip was not a good idea.

Subsequently, however, Brody had the company of Dougherty and Dougherty's girlfriend at a judicial conference in Hawaii. Judges were permitted to take along a lawyer, and in this case Brody attended the gathering with the same one who had accompanied Hackett to Atlanta in the spring.

. . . . .

It's noteworthy in the context of his relationships with Judges Hackett and Brody to point out that John Dougherty enjoys a standing appointment by the entire bankruptcy bench as trustee in all Chapter 13 bankruptcy cases filed in Michigan's Eastern District. That appointment is estimated to be worth $40–$50,000 a year in fees, in addition to what he earns as a lawyer for petitioners. The Bench also can revoke that appointment.

4. March 4, 1981, by Gene Fogel.

. . . . .

Bankruptcy Court is a web on entanglements, some of which push the limits of propriety. For instance, John Dougherty is the standing trustee for all Chapter 13 cases filed in Michigan's Eastern District. Judge David Patton is the presiding judge in all Chapter 13's. Yet, Dougherty has reportedly provided gifts, other favors and companionship for Patton's secretary. At the same time, Dougherty's law partner is engaged to marry Hackett's secretary. The women,

as a matter of course, have access to the confidential files of the judges.

5. The next broadcast was April 22, 1981 by Rod Hansen. The portions of that broadcast that referred to the plaintiff follow:

Before the law changed in late 1979, the judge appointed a receiver in each Chapter 11 case to oversee the operations of the company. Judge Hackett did just that in 1974, selecting Paul Borock as receiver to succeed a previous appointee who had died. But when Borock decided on an extended vacation at the end of 1978, Judge Hackett installed John Dougherty as interim receiver until April 15, 1979. In due course, Borock returned from Florida, but within a month Judge Hackett appointed Dougherty to serve an indefinite term as co-receiver—and to this day there are two.

It should be recalled that the second receiver overseeing Pioneer Engineering, John Dougherty, got attention in our previous News File series. He's the man who took his girl friend on a March 1979 trip to Atlanta with Judge Hackett for a judicial seminar to which attorneys were not invited. The trio was joined by a female court employee, who says she had been socializing with Judge Hackett for some time before making the flight to Atlanta. She says Dougherty paid for her transportation on the trip. He says he absolutely did not.

In any event, Dougherty was made a permanent co-receiver in the Pioneer case not long after the Atlanta journey. It would prove to be an expensive appointment for the financially-pinched company and a lucrative one for him. A look at the fees in our next program.

6. The next broadcast was April 23, 1981, by Gene Fogel. The portions relating to Mr. Dougherty follow:

John Dougherty became a permanent co-receiver of the Pioneer Engineering Company of Warren in April of 1979, seven years after the Company had filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Act. A few months earlier, he got an interim appointment from Bankruptcy Judge Harry Hackett when Paul Borock, the long-standing trustee, planned an extended winter vacation. Dougherty's more permanent engagement came hard on the heels of his social trip to Atlanta with Hackett, who went there for a closed seminar of bankruptcy judges.

All parties to the Pioneer case, including creditors waiting for their money, indicated that the presence of two receivers, should not increase the total amount paid in receivers' fees. But there was an increase, and a dramatic one.

During the five years that he was the lone receiver, Borock averaged annual payments of between $10,000 and $15,-000. Five months after Dougherty was placed permanently on board by Judge Hackett, a request went to the Court for interim fees of $100,000. The request was accompanied by a two-page explanation of the need, part of which claimed that the two receivers had made significant. progress in improving the company's financial position, and had devoted a significant amount of time to the project. The request did not include any time sheets detailing their work hours.

When the judge finally held a hearing on January 14 of this year, neither creditor's committee lawyer Alan Gilbert nor Daniel King, counsel for Pioneer, offered a challenge. Gilbert said later there wasn't enough information on which to base a challenge. King told reporters he thought the receivers' fee request was a little high, but figured there might be some out-of-court adjustment.

At 2:16 p.m. the next day, receivers Dougherty and Borock filed a justification for fees, a one paragraph statement, simply duplicated for every week from October 1979 until January 10 of 1981, including holiday periods, that claimed exactly 15 hours of work for the exact same tasks every seven days. Two minutes later, at 2:18 p.m., an order written by Dougherty and signed by Judge Hackett was entered on the record, but for $45,000 in interim fees, instead of $60,000. That two minute lapse certainly

didn't allow time for argument. Attorney Gilbert claims he hadn't seen the addendum time schedule that the receivers had filed. He was informed of its contents at an interview with WJR reporters last March. Also uncommon was a belated request by the debtor's attorney to have Judge Hackett approve authorization of a $25,000 fee payment that had already been doled out by receiver Dougherty months before, without prior Court authorization. The judge did belatedly approve the payment. There was no opposition.

7. The next broadcast was on May 11, 1981, by Gene Fogel, in which the following statements were made about plaintiff:

In May of 1979, Sterling Fireplace Company of Marysville retained attorney Stanley Bershad and filed for reorganization under the Federal Bankruptcy Code. The case was assigned to Bankruptcy Judge David Patton.

... In March 1980, the bankrupt owners consented to a petition putting the company into Chapter 7, which means the assets would be sold off and the unsecured creditors would get little, if anything. On the date of that action, John Dougherty was named interim trustee.

Two days later, Judge Harry Hackett appeared on the record, granting Dougherty permission to act as his own counsel and to hire Auctioneers of Lansing, owned by David Tebo, to liquidate assets for 10 percent of the gross, and expenses of no more than $3,000.

Sterling Fireplace Company's store manager, Wayne Crankshaw, was hired to help Tebo dispose of merchandise with a retail value he estimated at well over $100,000. At that point, Michigan National Bank of Port Huron held the first mortgage on the inventory. But its attorney told WJR News the bank was not notified of the liquidation, and other creditors weren't either. Dougherty says they were. The bank didn't know what had happened until months later, and in September 1980, it filed a petition to recover from John Dougherty all proceeds of the sale to satisfy the $26,000-plus mortgage it held.

Interestingly, although Dougherty was made Sterling Fireplace trustee in April 1980, the first meeting of creditors was not called until January 21, 1981, well after the assets were gone. On February 10, in response to Michigan National Bank's petition, Dougherty reportedly turned over what he said was all the money derived from the sales of assets, a sum of $16,583.51.

... Additionally, a Michigan National Bank lawyer says Trustee John Dougherty demanded payment of fees out of the $16,500 he turned over to the Bank.

8. The next program was broadcast on May 12, 1981 by Rod Hansen. The significant points of that broadcast that relate to plaintiff follow:

Already on the record through these programs are some potentially profitable relationships between judges, lawyers, court employees and others connected with the court.... There are [those] who profit by almost literally salvaging what they can of the wreckage. They are the liquidators, appointed by the trustees or receivers to dispose of the assets of a bankrupt business in return for a percentage of gross sales.

One such liquidator is David Tebo. He's handled several of the disposal sales, among them the liquidation of Michigan Sofa Company....

. . . . .

... Michigan Sofa agreed that liquidator David Tebo would purchase the inventory—the owner said they received a very fair price for the inventory. What Tebo paid Michigan Sofa was turned over to NBD to satisfy part of the debt....

Then it became Tebo's turn to sell the merchandise he had bought from Michigan Sofa—doing it at the bankrupt company's own stores on Eureka Road in Southgate and in East Detroit. But WJR's investigation indicates not all was sold; that some apparently was given away....

Some other items found their way out of the Eureka Road store while Tebo was selling off the Michigan Sofa Bed inven-

 tory, and the circumstances are unclear. Attorney John Dougherty, standing trustee for all Chapter 13 bankruptcies in the Detroit court administered by Judge David Patton, and an active trustee and lawyer in other cases, picked up several pieces of furniture. That's according to Tebo's salesman on the premises, Wayne Crankshaw, who says one morning he arrived at the store to find a variety of items tagged with the name Linda. Crankshaw says Tebo told him not to worry about the items, that John Dougherty would be by to pick them up. Sure enough, in about a week, on a Saturday morning, Dougherty and a young woman appeared—according to Crankshaw—borrowed a truck from the store and drove away with eight or nine items. Tebo now says he didn't sell Dougherty anything. Dougherty's sometimes girl friend, and Judge Patton's secretary, Linda Oroz, refuses to talk about it.

.　.　.　.　.

Dougherty first said he never heard of Michigan Sofa, never obtained anything there, and didn't know where the store was located. Then he insisted that WJR's questions be submitted in writing. They were, two weeks ago, and so far there's been no response.

9. The final broadcast was made by Gene Fogel on July 8, 1981.

In the case of Information Control Services of Ann Arbor, the horse followed the cart through the unchartered wastes of Bankruptcy Court. And now U.S. District Court is trying to find the path it took. A Chapter VII involuntary bankruptcy was filed in 1978, and Detroit attorney John Dougherty became receiver in the case. In March of this year, Dougherty officially called a final meeting of creditors and submitted his petition for a $40,000 fee to cover his services. Subsequently, he also asked that all matters in the case be settled before June 30, the last day of Judge Harry Hackett's term in office.

Bankruptcy Court Docket Supervisor Sheila Tighe noticed some bothersome elements in the Information Control Services case and decided to keep a closer-than-usual watch. For one thing, there was a petition for a final meeting of creditors, but there never was a record of a required first meeting of creditors. For another, there was no order in the file appointing Dougherty as trustee.

Tighe took the file to Acting Chief Clerk David Sherwood last month, and he called in U.S. District Court Chief Clerk John Mayer. The three of them noted other irregularities. One was the absence of notices to creditors about ongoing actions in the case. Another was the sale of assets for $3,000, even though there was a bid of $5,000 on the record.

On June 23, the receiver, Dougherty, went to Judge Hackett and obtained a *nunc pro tunc* order designed to retroactively fix up the three-year-old case record by appointing a trustee and calling for a first meeting of creditors. With the oversights conveniently corrected, Dougherty could still hope for a final meeting and approval of his $40,000 fee before Hackett left office, as the first Bankruptcy Judge under the new Bankruptcy Code not to be reappointed.

But that plan came apart when the Bankruptcy Clerk took the file to U.S. District Court Chief Judge John Feikens. The Judge, noting Hackett's imminent departure, put the case on hold. Now it has been assigned by blind draw to U.S. District Court Judge Avern Cohn for a full review.

Nothing in the Information Control Services file showed so much as who the creditors were, meaning it would be impossible to inform them of a first meeting, or any other meeting. The record does show an order from Judge Hackett, in February of 1978, for a list of creditors within 30 days. But the record does not show that the order was acted upon. Nor does it show any follow-up action by

the Judge because his show cause order was ignored.

One bankruptcy lawyer said such orders frequently have been ignored in the past, that creditor lists are supposed to be filed by the bankrupt, and that the failure of the record to show a trustee appointment and a first meeting of creditors probably was a foul-up.

Acting Clerk Sherwood's view is that, whatever the customs and clerical errors of the past, they are past—and correction should start immediately.