PEREZ, APPELLEE, *v.*
SCRIPPS-HOWARD BROADCASTING COMPANY ET AL., APPELLANTS.

[Cite as Perez *v.* Scripps-Howard Broadcasting Co. (1988),
35 Ohio St. 3d 215.]

(No. 87-34—Decided March 9, 1988.)

*Harry W. Schmuck* and *James P. Adlon,* for appellee.

*Baker & Hostetler, Louis A. Colombo* and *Charles E. Jarrett,* for appellants.

HERBERT R. BROWN, J. This case calls upon us to decide whether summary judgment was properly entered against the plaintiff in a public-official defamation case. For the reasons which follow, we find that it was.

I

The law of defamation has been given much attention by the federal courts and by this court. Rather than repetitiously plough old ground, we think it sufficient to sketch the law which serves as the foundation on which this case must be decided.

*New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, 279-280, "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The proof of actual malice must be clear and convincing. *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, 342. In making that measurement, the focus is upon the defendant's attitude toward the truth or falsity of the published statements, rather than upon the existence of hatefulness or ill will. *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74; *Herbert* v. *Lando* (1979), 441 U.S. 153. The plaintiff's burden is to show with convincing clarity that: (1) the false statements were made with a high degree of awareness of their probable falsity, *Garrison, supra,* at 74, or (2) the defendant entertained serious doubts as to the truth of the publication, *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731. On appeal, the appellate court must exercise its independent judgment in deciding whether the evidence of record meets these tests. *Bose Corp.* v. *Consumers Union of United States, Inc.* (1984), 466 U.S. 485, rehearing denied (1984), 467 U.S. 1267.

On these basic principles, the law of Ohio and federal law are in accord. *Grau* v. *Kleinschmidt* (1987), 31 Ohio St. 3d 84, 31 OBR 250, 509 N.E. 2d 399; *Scott* v. *News-Herald* (1986), 25 Ohio St. 3d 243, 25 OBR 302, 496 N.E. 2d 699; *Dupler* v. *Mansfield Journal Co.* (1980), 64 Ohio St. 2d 116, 18 O.O. 3d 354, 413 N.E. 2d 1187, certiorari denied (1981), 452 U.S. 962.

II

It is against this history of First Amendment protection that we review the summary judgment granted in favor of the defendants.

Neither we nor the trial court may weigh the proof or choose among reasonable inferences in deciding whether summary judgment should be granted. As in other civil cases, inferences and questions of credibility must be resolved in plaintiff's favor. *Dupler, supra.*

Nonetheless, summary judgment remains an especially appropriate procedure by which First Amendment issues are resolved. *Dupler, supra,* at 120, 18 O.O. 3d at 357, 413 N.E. 2d at 1191. See, also, *Washington Post Co.* v. *Keogh* (C.A.D.C. 1966), 365 F. 2d 965, 968.

In order to withstand a defendant's motion for summary judgment in a libel action, a public official-plaintiff must produce evidence sufficient to raise a genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity. *Bukky* v. *Painesville Tel. & Lake Geauga Printing Co.* (1981), 68 Ohio St. 2d 45, 22 O.O. 3d 183, 428 N.E. 2d 405. Moreover, only

factual disputes that might affect the outcome of the suit under the governing law will preclude the entry of a summary judgment. *Anderson* v. *Liberty Lobby, Inc.* (1986), 477 U.S. 242.

## III

We now look at the evidence, resolving issues of credibility in favor of the plaintiff and giving plaintiff the benefit of inference. We find that WEWS and Younkin portrayed Perez as an official who invited Ferren to run drugs and to wheel and deal in drugs on the streets.

The five material issues identified by the court of appeals and much of the argument submitted on behalf of Perez are directed towards establishment of the above conclusion. For example, the arguments made by Perez about editing, rehearsal of Ferren's story, and request by Younkin to make the statements stronger, all go to prove that WEWS portrayed Perez as soliciting a drug runner. We accept, for the purpose of summary judgment, that WEWS and Younkin reported such a charge. Thus, the above arguments and the so-called disputes as to "material facts" become minimally relevant. The attitude of the publisher toward the subject, be it hate or ill will, is relevant to the inquiry into malice but it is not the pivotal issue. The inquiry into actual malice in a public-official defamation case should focus on the publisher's attitude toward the truth rather than upon the publisher's attitude toward the plaintiff.

Here, a charge was made by Ferren which can reasonably be interpreted as a charge of illegal activity by a public official and the county department for which he worked. The airing of such charges is precisely the type of publication which the First Amendment does and must protect.

We acknowledge that report of a charge against a public official may work an unfairness to that person. Indeed, the broadcast may have worked an unfairness in the present case. But we agree with the United States District Court for the Southern District of New York when it stated:

"The fairness of the broadcast is not at issue in the libel suit. Publishers and reporters do not commit a libel in a public figure case by publishing unfair one-sided attacks. The issue in the libel suit is whether the publisher recklessly or knowingly published false material." *Westmoreland* v. *CBS, Inc.* (S.D.N.Y. 1984), 601 F. Supp. 66, 68.

Unfairness is inevitable whenever the facts which form the basis of a charge, made against an official, are subject to two or more interpretations. Here, two interpretations may reasonably be made of the Ferren information. The court of appeals recognized such when it identified its first disputed issue of fact. The dispute supports (rather than precludes) the issuance of a summary judgment.

Fairness in journalism is a laudable goal but it is not a condition precedent to First Amendment protection. In fact, unfairness is the daily grist of politics. A public official acts, makes statements, and leads a personal life. Value judgments and interpretation attach to a public official's behavior. If the suggestion of criminality is a reasonable inference from something a public official has said or done, the media may draw that inference. Such is the First Amendment's contribution to free, open and honest government.

The essential facts are that Ferren, an admitted drug dealer in Stark County, had not been convicted on any of his drug law violations. He was, on two occasions, asked by Perez about the possibility of being an informant and undercover agent for the Stark

County Sheriff's office.[1] Later and while Ferren was in jail for committing a theft on New Year's eve, he was taken from his cell to the office of Perez. According to Ferren, Perez asked Ferren to sell drugs, this time not as an undercover agent or as a "cop." Perez offered to set Ferren up so that Ferren could wheel and deal on the streets. Ferren was told he would be working for Perez and was asked to do runs between Ohio and Michigan.

Perez, in his affidavit, does not deny that the meeting with Ferren took place. Nor does he deny Ferren's report of what was said. Rather, he claims that the conversation was taken out of context.

It is possible that Ferren misunderstood Perez. It is possible that, in the context of the earlier meetings between the two, Ferren was being solicited as an undercover agent in the third meeting as well. It is also possible that the final meeting represented a shift by Perez: that Perez was no longer asking Ferren to work in an undercover role.

Before putting Ferren's version of the encounter on the air, the appellants repeatedly attempted to reach Perez at home and at the sheriff's office to obtain his explanation. The appellants confirmed that Ferren had been in jail when he said he was and that a meeting between Perez and Ferren took place. Ferren's employment was verified. Other law enforcement personnel were interviewed, none controverting Ferren's statements.

Finally, Ferren stated, in the deposition submitted by Perez to oppose the summary judgment, that he told Younkin the truth to the best of his understanding at the time.

In any broadcast, there will be a selection made as to what is newsworthy. The relevant question is whether that selection is made with a view toward dissemination of false information. See *Pierce* v. *Capital Cities Communications, Inc.* (E.D. Pa. 1977), 427 F. Supp. 180, 185-186, affirmed (C.A. 3, 1978), 576 F. 2d 495, certiorari denied (1978), 439 U.S. 861. See, also, *Dougherty* v. *Capitol Cities Communications, Inc.* (E.D. Mich. 1986), 631 F. Supp. 1566; *Brasslett* v. *Cota* (C.A. 1, 1985), 761 F. 2d 827. In the present case, the omission of material does not demonstrate a disregard for the truth. Rather, it demonstrates that appellants elected to make one of two reasonable interpretations of Ferren's story.

Similarly, the truth or falsity of the story was not altered by the request that Ferren make his statements stronger and clearer. *Tavoulareas* v. *Piro* (C.A.D.C. 1987), 817 F. 2d 762, certiorari denied (1987), 484 U.S. ____, 98 L. Ed. 2d 151.

Where sensationalism is sought at the expense of the truth, actual malice could be inferred. But actual malice is not inherent in a journalistic effort to produce hard-hitting reports which serve the public interest. The distinction between sensationalism and investigative journalism lies in the attitude of the publisher toward the truth. Here, it cannot reasonably be said that the appellants sought sensationalism at the expense of the truth.

The offer to pay Ferren's legal fees, if relevant at all, demonstrates a belief in the truth of the broadcast and of the right to air it.

The fact that the questions put to Ferren and his answers were re-

---

[1] Younkin does not acknowledge that he was told about any prior meetings where Ferren was asked to act as an undercover agent. However, for the purpose of summary judgment, we accept as true that such meetings occurred and that Younkin was informed of them.

hearsed is essentially neutral. See *Silvester* v. *American Broadcasting Cos.* (S.D. Fla. 1986), 650 F. Supp. 766. Rehearsal does not tend to establish either (1) a high degree of awareness of the falsity of the broadcast or (2) that appellants entertained serious doubts as to the truth of the broadcast.

Finally, appellee draws attention to the role played by those affiliated with the campaign to unseat the Stark County Sheriff. It may be taken as true that such politically interested persons arranged the interview with Ferren, were present at the taping of the broadcast, and hoped that the broadcast would impact favorably on the campaign of their candidate. But this, also, bears little relationship to the truth of the broadcast or to the attitude of the appellants toward the truth. See *Woods* v. *Evansville Press Co.* (C.A. 7, 1986), 791 F. 2d 480, 488.

What stands out in this case is: that Ferren reported an encounter with Perez which could be interpreted as appellants did in making their broadcast; that Perez has not denied the report of the encounter as described by Ferren on the telecast; that Perez did not avail himself of the opportunity to tell his side of the story; and that appellants conducted an investigation which produced no indication that Ferren's description of what happened was unreliable.

In a public-official defamation case, summary judgment is properly granted for the defendant where no genuine issue of fact exists on the question of whether the publication was made with a high degree of awareness of its falsity. The evidence, taken most favorably to appellee, fails to meet this test. *Garrison, supra.* Nor is there a basis to find that appellants entertained serious doubts as to the truth of the broadcast. *St. Amant, supra.* In short, clear and convincing evidence does not exist to support the contention that appellants knowingly and recklessly broadcast an untruth which defamed the appellee.

Since we find no evidence from which a reasonable jury could find actual malice with convincing clarity, we reverse the judgment of the court of appeals and reinstate the summary judgment granted by the trial court.

*Judgment reversed.*

MOYER, C.J., LOCHER, DOUGLAS and WRIGHT, JJ., concur.

SWEENEY and HOLMES, JJ., dissent.

HOLMES, J., dissenting. Because I view this case as containing justiciable issues under *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, and its progeny, I must dissent.

It is well-settled that defamation actions will not lie for the occasional and inevitable erroneous statement. *New York Times Co., supra,* at 271-272; *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74; *Time, Inc.* v. *Hill* (1967), 385 U.S. 374, 388. On the other hand, the author of *New York Times* also determined that:

"The use of *calculated falsehood,* however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those *unscrupulous enough* and *skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. * * ** That speech is used as a tool

for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. `* * *`'' (Emphasis added.) *Garrison, supra,* at 75.

By its decision today, the majority has upheld the grant of summary judgment where the plaintiff's depositions, affidavits, and pleadings demonstrated the existence of the factual issue of whether he may reasonably have been the victim of a maliciously published calculated falsehood, which was so published by a reporter in league with a political candidate, and who sought to directly affect the outcome of a political contest. Where triable issues of this magnitude are before this or any other court, it is imperative that such occurrences be exposed to the full light of trial. Contrary to the majority view, the United States Supreme Court has stated that summary judgment is generally not utilized to decide a defamation case where the publisher's state of mind is called into question under the "actual malice" standard. See, *e.g., Hutchinson* v. *Proxmire* (1979), 443 U.S. 111, 120, at fn. 9; *Wolston* v. *Reader's Digest Assn., Inc.* (1979), 443 U.S. 157, 161, at fn. 3.

In the case *sub judice,* the relevant focus must be upon the conduct and state of mind of the publisher, *Curtis Pub. Co.* v. *Butts* (1967), 388 U.S. 130, 153, whether there was an intent to inflict harm through falsehood, *Garrison, supra,* at 73, and whether the publisher knew or had "reason to suspect that his publication * * * [was] false," *Herbert* v. *Lando* (1979), 441 U.S. 153, 160. Where the reporter "must have known that a number of the statements in the feature story were untrue," then a finding of calculated falsehood is justified. *Cantrell*

v. *Forest City Pub. Co.* (1974), 419 U.S. 245, 253.

Under the above standard, construing the allegations and supporting materials of the parties in favor of plaintiff, as Civ. R. 56 requires, it can only be concluded that a motion for summary judgment ought not to have been granted to the defendant. In Captain Perez's amended complaint, he avers that the publisher reported that he had seized illegal drugs which were "then subsequently resold in the streets by the plaintiff * * *." In paragraph eleven, he states that such report was untrue, and in paragraph fourteen he states that "all of which statements and implications were false and untrue * * *." These allegations were reiterated in his answers to defendant's first set of interrogatories at paragraphs four and five, as well as within his deposition at pages 113, 114, 118 and 128. We have, then, allegations of a publication and that such publication was false.

Moreover, on the issue of actual malice, Captain Perez averred in his complaint that the false statements were "known to be untrue or with proper inquiry would have been found to be false and were deliberately made by defendant Younkin * * *." The above allegations which were reiterated in his deposition were opposed by the publisher in his affidavit which asserted little more than his denial of wrongdoing and, as relied upon by the trial court, that he believed in the witness' credibility and had fairly and accurately reported the criminal charges against Captain Perez. The law is, however, clear upon the point that the deposition of a publisher that he acted in good faith will not "automatically" overcome contrary statements in a summary judgment proceeding. See *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 732.

More particularly, Captain Perez

relied upon two specific allegations which, if either were proven at trial, could satisfy the "actual malice" standard under applicable law. First, it was asserted that the publisher relied upon one known to be a drug dealer, who was known to have a criminal record and was of bad repute, and that the publisher failed to investigate the informant's allegations. The law in this area is beyond dispute. Whenever the publisher asserts reliance upon the word of an informant, the inquiry may shift to the reputation of the informer for veracity. *St. Amant, supra,* at 733. Furthermore, *"recklessness* may be found where there are obvious reasons to doubt the veracity of the informant *or* the accuracy of his reports." (Emphasis added.) *Id.* at 732. This may also imply a subjective awareness of probable falsity, *i.e.,* that the publisher, " 'in fact entertained serious doubts as to the truth of his publication.' " *Herbert* v. *Lando, supra,* at 156-157, quoting *St. Amant, supra,* at 731.

Applying such standards to the present case we find, as undisputed fact, an informant with a criminal past who was a known drug dealer, and whose services as a drug informant had been refused by Captain Perez some time prior to the interview. That the publisher knew of his informant's criminal past cannot be doubted since he made such past a part of his presentation, and also because he had procured the story in cooperation with the candidate who was ultimately elected. The publisher's statement that he sought police comment is, first of all, only of tangential use on the issue of whether the publisher failed to investigate the accuracy of the report. There may have been fair reason to refuse comment to the publisher. For example, a story by Younkin revealed the secret location of the narcotic squad's operational base, the various methods used to investigate drug dealers, as well as the identities of participating enforcement agents. Further, in Captain Perez's deposition, he stated that he refused to talk to the publisher because, on a prior occasion when discussion was had over a particular matter, the publisher "went back to the TV and told them just the opposite." Also, he stated under oath that he had no knowledge as to the subject of the publisher's phone calls. By reliance upon unanswered phone calls, the publisher can hardly be said to have discharged his duty to investigate the accuracy of an obviously suspect story initiated by a source having every motive to destroy the effectiveness of the narcotics unit.

The second allegation was that the publisher had adjusted the informant's version of the events. This allegation is contained in Captain Perez's affidavit and made in express reliance upon revelations of such conduct set forth in the deposition of the informant. Evidence of the editorial process, *i.e.,* the decision-making process, to include or exclude particular material or to publish one version of a story instead of another, is particularly relevant in determining the existence of actual malice. *Herbert* v. *Lando, supra,* at 157, 173. An "examination of the editorial process [is appropriate] to prove the necessary awareness of probable falsehood * * *." *Id.* at 172. In the instant case, the informant's deposition stated that during rehearsals for the on-camera interview, the publisher solicited changes in wording, both to eliminate and to substitute words, for the stated purpose of making such statements "stronger." This statement clearly provides evidence upon the issue of actual malice. Therefore, these matters should be remanded for trial as presenting triable issues.

Accordingly, I dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.