JOURNAL ENTRY AND OPINION
In these consolidated appeals defendants-appellants Donald McMahan and McMahan's Wrecking, Inc., d/b/a D M Wrecking, Inc., ("McMahan Wrecking"), challenge the jury verdict awarding compensatory and punitive damages against both of them on appellee Gregory Baeppler's claim of defamation. Because the claim against McMahan's Wrecking is based upon respondeat superior, they assert error resulted from inconsistent verdicts that awarded different damages against McMahon and his employer. They further allege Judge Anthony J. Calabrese, Jr. erred when he denied their motion for judgment notwithstanding the verdict or, in the alternative, a new trial and when he granted Baeppler's motion for attorney fees. We agree in part; affirm the judgment against McMahan individually; vacate both the judgment against McMahan's Wrecking and the award of attorney fees.
The record discloses the following operative facts and procedure. In February 1996, Commander Gregory Baeppler was employed by the City of Cleveland, Division of Safety, Department of Police, in the Second District. McMahan's Wrecking, located at 3380 West 65th Street, is engaged in the business of towing, dismantling wrecked automobiles, repairing automobiles, and selling some used cars. It is within the geographical confines of the First District but is contiguous to that of the Second District.
In January 1996, McMahan believed Edward Koziol, an employee, had stolen computer diagnostic equipment from his repair shop, based upon information he received through a phone call from Koziol's brother. When Koziol visited the shop, McMahan "tried to negotiate" with him and a fight broke out. McMahan then reported the loss of the equipment to the Cleveland police but, by the time the police arrived, the equipment had been "returned." McMahan was charged with felonious assault and kidnapping, and eventually pleaded guilty to aggravated assault with a violence specification. McMahan contended Baeppler used his power to get him indicted on those charges.
On February 8, 1996, with the charges against him pending, McMahan dictated a letter to Deborah McMahan, his then-wife, a McMahan Wrecking employee and its president.[1] The letter, (Exhibit A) although not "word for word" as he dictated it, apparently reflected his sentiments. Ms. McMahan admitted typing the letter on company time with company equipment on plain white paper although company letter-head stationary was available. The letter was addressed to William Denihan, Safety Director for the city, "bring[ing] to [his] attention a misuse of power" by Baeppler in exercising a personal "vendetta over hearsay" against McMahan and how he conducted his business. At trial, McMahan claimed that Cleveland police officers had told him that Baeppler was "after" him.
The letter recounted McMahan's version of the circumstances surrounding Koziol's theft and injuries and asserted that Koziol's name mysteriously had been removed from the theft report. He also reported a man named Stewart, who installs drywall, had been arrested in the Second District on two drunk driving charges and domestic violence charge. According to McMahan, Baeppler approached Stewart in jail and requested Stewart's services in exchange for Baeppler's "help *** with these serious charges he was facing." McMahan then alleged that Stewart's "paperwork" was lost, the charges were dropped, he was released from jail and Baeppler had drywall work done in his house for free. At trial, McMahan claimed that he received this information from Stewart himself and admitted that Stewart did not perform the work at Baeppler's house but only because, after getting out of jail, Stewart "stiffed" Baeppler.
McMahan also asserted in the letter that he called Mothers Against Drunk Driving ("M.A.D.D."), about Baeppler and the drywall incident and he planned to file a civil suit against Baeppler, the commander of the First District, certain detectives, and others. He requested that Denihan do his "civic duty and investigate these allegations" to his "best ability." McMahan invited him to "stop and see me or call me anytime at McMahan's Wrecking." McMahan copied the letter to the City's complaint department, Mayor Michael White, Paul Orlosky of Channel 3 News, and McMahan's criminal defense lawyer.
At trial, McMahan explained that the shop was located across the street from the geographical confines of the Second District and that Second District police officers would often visit his shop while on duty. As a result, Baeppler, or someone in command at the Second District, issued a directive ordering officers away from the shop unless they were on official business. McMahan admitted that he lost business as a result of that directive.
McMahan admitted that, sometime in 1991 when he was a director on the board of the Stockyard Merchants Association, he became upset when Baeppler appeared at a meeting and directed, what McMahan took to be, a derogatory look at him. McMahan explained that, although they had resolved any differences between them after the meeting, he admitted feeling resentful that Baeppler worked security for rock groups rather than protecting the community.
Baeppler testified that he was only following departmental regulation when he ordered his patrol officers to cease spending time, while on duty, for personal reasons at McMahan's business. He claimed he spoke to McMahan in 1992 and explained the reasons for the directive, including community safety reasons.
Sergeant Adrian Candelaria of the Professional Conduct and Internal Review Unit (PCIR) of the Police Department investigated the allegations contained in McMahan's letter. On February 16, 1996, Candelaria interviewed Stewart who denied doing drywall work for Baeppler and further, stated that McMahan had called him the previous week asking whether he had done such work. Stewart said he had told McMahan that he wished McMahan had contacted him before making such accusations to the press. While Candelaria and his partner were interviewing Stewart, they discovered an outstanding warrant for his arrest and took him into custody. Candelaria denied having promised McMahan that he would not arrest Stewart.
On February 27, 1996, Candelaria interviewed Daniel Hejny, a custodian at the jail, about Stewart and the drywall allegations. Hejny explained that his nephew had remodeled the bathroom in Baeppler's home and, knowing that his nephew needed someone to do drywall work, had asked Stewart, whom he knew through a cousin, whether he was available to do the work after he was released from the jail, and that Stewart agreed. Hejny explained, however, that his nephew did hire someone to do the drywall work and had not needed Stewart. At trial, Hejny testified that Baeppler had never approached him about Stewart or anyone else doing drywall work. Hejny explained that, after Baeppler had hired his nephew, he took it upon himself to find laborers for Baeppler.
Candelaria also interviewed Koziol about the assault. Koziol indicated that he was an employee of McMahan's Wrecking and had borrowed the diagnostic equipment to work on his own vehicle. Koziol stated that McMahan would allow his employees to borrow the equipment but, when he had not returned the equipment to its original location in the shop, McMahan thought it had been stolen.
In an undated letter addressed to McMahan, Candelaria advised that members of his unit had tried to make personal contact with him and, because of his failure to cooperate with the investigation, "members of this unit will terminate this investigation within five working days from receipt of this letter." McMahan responded by letter dated March 26, 1996, indicating, in part, that he declined to speak with a representative of the unit because, despite police assurances to the contrary, they arrested Stewart while investigating McMahan's allegations. McMahan felt, therefore, instead of investigating his allegations, the PCIR was investigating him. He copied the letter to the same individuals noted on the February 8, 1996 letter.
Based upon the investigation, which included interviews with others, Candelaria concluded that McMahan had tried to get preferential treatment from police on the assault charges and, when this was not forthcoming, chose to take different tactics.
Baeppler filed his complaint against McMahan and McMahan Wrecking on April 12, 1996. After a number of continuances, the trial began on June 24, 1998. Baeppler claimed he was compelled to bring the suit because McMahan's allegations that he fixed a criminal case, in itself a criminal act, reached well into the police department, the community, and the street. They not only tarnished his stellar reputation but would adversely affect community confidence. Baeppler previously had been honored by M.A.D.D. for his officers' enforcement of DWI laws and, while attending a M.A.D.D. function, he had been questioned about the allegations that he "fixed" a case. He denied ever taking part, during his thirty-year career, in any action that would be detrimental to a successful prosecution. Baeppler explained that the general outcome of a PCIR investigation is a criminal felony trial punishable by a penitentiary term. Because the investigation was closed, he never had that forum to clear his name, and this civil suit afforded him that opportunity.
On June 29, 1998, the jury returned a verdict in favor of Baeppler and against McMahan for $15,000 in compensatory damages and $25,000 in punitive damages, and against McMahan Wrecking for $10,000 in compensatory damages and $10,000 in punitive damages. McMahan and McMahan's Wrecking filed a Motion for Judgement Notwithstanding the Verdict or, in the alternative a New Trial on July 13, 1998, which was denied. An appeal was filed from the verdict and a second was filed from the denial of the July motion.
On September 3, 1998, Baeppler filed a motion for attorney fees. After hearing, the judge granted the motion on January 25, 1999, and awarded $11,593.96 which represented 66.25 hours of work at the hourly rate of $175.00. McMahan and McMahan's Wrecking filed their third appeal on February 22, 1999.
 Case Nos. 74938 and 75131
The first assignment of error states:
 AS THE PLAINTIFF HAS TOTALLY FAILED TO PROVE MALICE, THE LETTER IS PROTECTED SPEECH UNDER THE FIRST AMENDMENT [;] THEREFORE, THE COURT SHOULD HAVE DIRECTED A VERDICT IN FAVOR OF THE DEFENDANTS, OR IN THE ALTERNATIVE, ENTERED JUDGMENT IN THEIR FAVOR FOLLOWING THE VERDICTS.
They argue that, because it was stipulated that Baeppler is a public figure, he was required to show that McMahan harbored "malice" when making the alleged defamatory statements but, failed to show such malice by clear and convincing proof. Baeppler counters these assertions, claiming that he presented substantial and competent evidence to support the element of malice.
The standard for granting a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A). Texler v. D.O.Summers Cleaners Shirt Laundry Co. (1998), 81 Ohio St.3d 677,679, 693 N.E.2d 271. When considering a motion for directed verdict pursuant to Civ.R. 50(A), the judge must construe the evidence most strongly in favor of the party against whom the motion is directed. Civ.R. 50(A) (4). The motion tests the legal sufficiency of the evidence to support a prima facie claim and, therefore, presents a question of law. Grau v. Kleinschmidt
(1987), 31 Ohio St.3d 84, 90, 509 N.E.2d 399; see, also, Dimora v.Cleveland Clinic Found. (1996), 114 Ohio App.3d 711, 716,683 N.E.2d 1175. The judge may not weigh the evidence nor test the credibility of the witnesses but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. Zavasnik v. Lyons Transp. Lines, Inc. (1996), 115 Ohio App.3d 374,378, 685 N.E.2d 567; see, also, Strother v. Hutchinson
(1981), 67 Ohio St.2d 282, 284, 423 N.E.2d 467. The judge shall direct a verdict in favor of the moving party only after he has found "that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted [by the nonmoving party] and that conclusion is adverse to the [nonmoving party.]" Civ.R. 50(A) (4). Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the motion must be denied.Ramage v. Cent. Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97,109, 592 N.E.2d 828. Upon review, an appellate court applies the same standard as that of the trial judge. See Texler,81 Ohio St. 3d at 780.
McMahan and McMahan Trucking contend that Baeppler failed to submit proof of "malice." A public official may not "recover
damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Perez v. Scripps-HowardBroadcasting Co. (1988), 35 Ohio St.3d 215, 218. 520 N.E.2d 198, quoting New York Times Co. v. Sullivan (1964), 376 U.S. 254,279-280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686.
 Actual malice may not be inferred from evidence of personal spite ill-will or intention to injure on the part of the writer. Beckley Newspapers Corp. v. Hanks (1967), 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248; Rosenblatt v. Baer (1966), 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597. Rather, the focus of inquiry is on defendant's attitude toward the truth or falsity of the [413 N.E.2d 1191] publication, Herbert v. Lando
(1979), 441 U.S. 153, 160, 99 S.Ct. 1635, 1641, 60 L.Ed.2d 115, and a public official may recover only upon clear and convincing proof of actual malice. Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789; New York Times, supra, at pages 285-286, 84 S.Ct. at page 728. There must be a showing that false statements were made with a "high degree of awareness of their probable falsity ***." Garrison v. Louisiana (1964), 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125. [Dupler v. Mansfield Journal Co., Inc. (1980), 64 Ohio St.2d 116, 119, 413 N.E.2d 1187.]
Similarly, malice may be shown where "the defendant in fact entertained serious doubts as to the truth of his publication."Dupler, 64 Ohio St.2d at 119, quoting St. Amant v. Thompson (1968),390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262.
The evidence presented at trial showed that McMahan made the statements contained in the letter with a high degree of awareness that the statements were probably false. About the "drywall incident," McMahan had claimed in the letter that Baeppler had received free drywall work in exchange for the charges against Stewart being dropped, but McMahan admitted that Stewart never performed the work. While McMahan claimed that he had verified the information contained in the letter with Stewart, Calendaria's interview with Stewart revealed that McMahan did not speak to Stewart until after he had sent the letter. In addition, the record shows that Baeppler, in his capacity as the Second District Commander, did not learn about McMahan's subsequent indictment for the assault of Koziol until after the event. Moreover, the incident fell under the jurisdiction of the First, not the Second, District.
Finally, the fact that these allegations coincided with McMahan's criminal indictment also support Baeppler's burden of proof. At trial, McMahan claimed to have many friends who were police officers; enough to form a line along the nine city blocks between the Justice Center and East Ninth Street. Despite these "friendships," McMahan did not receive the preferential treatment he expected regarding these charges and, apparently, tried to avoid liability by casting aspersions about Baeppler as the motivation behind the indictment.
Based upon the foregoing, Baeppler produced substantial, competent evidence tending to show that McMahan made such accusations with a "high degree of awareness of their probable falsity." Dupler, 64 Ohio St.2d at 119, quoting Garrison,379 U.S. at 74, 85 S.Ct. at 215.[2] Therefore, the judge did not err when he denied McMahan's motion for judgment notwithstanding the verdict. The first assignment of error is overruled.
The second assignment of error states:
 THE VERDICTS RETURNED AGAINST DON McMAHAN, INDIVIDUALLY, AND THE BUSINESS ARE INCONSISTENT AND ARE NOT SUPPORTED BY ANY EVIDENCE.
They argue that even though McMahan was an employee and Deborah McMahan was president of the business, Baeppler failed to prove that he dictated the letter in the scope of his employment. Moreover, under the doctrine of respondeat superior, McMahan's Wrecking could only be held vicariously liable for McMahan's acts and, therefore, the jury verdicts finding them liable for different amounts for both compensatory and punitive damages are contrary to law. Baeppler argues that the evidence supports the awards.
Civ.R. 59(A) (7) allows a judge to grant a new trial for the reason that the judgment is contrary to law. When a party asserts that a judgment is contrary to law pursuant to Civ.R. 59(A) (7), the question presented is one of law which requires a review of facts and evidence; it does not involve a consideration of the weight of the evidence or credibility of the witnesses. Pangle v. Joyce
(1996), 76 Ohio St.3d 389, 391, 667 N.E.2d 1202, citing O'Day v.Webb (1972), 29 Ohio St.2d 215, 280 N.E.2d 896, paragraph two of the syllabus. The role of this court, when reviewing the grant or denial of a motion for new trial based upon Civ.R. 59(A) (7) is to decide whether the judge erred as a matter of law. See O'Day,29 Ohio St.2d 215, paragraph one of the syllabus; Pangle,76 Ohio St. 3d at 391.
Throughout his complaint, Baeppler claimed McMahan Wrecking was liable to him under the theory of respondeat superior because McMahan was acting within the course and scope of his employment and because the business had knowledge of his acts and ratified such acts.
In order for an employer to be held vicariously liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. E.g., Byrd v. Faber
(1991), 57 Ohio St.3d 56, 59, 565 N.E.2d 584, 566. Where the employees's tort is alleged to be intentional, the wrongful act "must be calculated to facilitate or promote the business for which the servant was employed." Id.; accord Kuhn v. Youlten (1997),118 Ohio App.3d 168, 176, 692 N.E.2d 226. In addition, R.C.2315.21 (eff. Jan. 5, 1988) provides for the imposition of punitive damages against a corporate employer, where a plaintiff has proven actual damages and:
 (1) the actions or omissions of that defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that: defendant as principle or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.
On February 6, 1996, McMahan, a corporate officer, dictated a letter to his then-wife, the corporate president of McMahan Wrecking, which she typed on a plain piece of paper. This letter is Baeppler's only basis for the claim against McMahan personally and could not be the basis for a separate claim against McMahan Wrecking because he neither pled, presented evidence, nor asked the jury to consider them as joint, several or concurrent tortfeasors. Thus, McMahan Wrecking's responsibility for Baeppler's damages cannot differ from that incurred by McMahan because its liability is only vicarious as a matter of law. Wells v. Spirit Fabricating,Ltd. (1996), 113 Ohio App.3d 282, 680 N.E.2d 1046, appeal not allowed (1997), 77 Ohio St.3d 1514, 674 N.E.2d 369. Similarly, as this case involved only the composition and sending of the letter, nothing more, McMahan Wrecking must be either free from any liability or bear equal responsibility with McMahan — nothing in between. There can be no subtle distinction between two halves of an umbrella.[3] McMahan is primarily liable and McMahan Wrecking would be secondarily, not separately, liable to Baeppler. Wells, supra.
For the jury to find McMahan's Wrecking vicariously liable for $10,000 in compensatory damages and $10,000 in punitive damages when it found McMahan individually liable for $15,000 in compensatory and $25,000 in punitive damages resulted in verdicts contrary to law.
While the dissent suggests that the verdict forms, themselves, were the root of the problem and that McMahan Wrecking waived appellate review on this assignment of error by failing to object to the content of those forms that is not the case. There is nothing objectionable about the verdict forms. McMahan Wrecking objected to the jury instructions and did, in fact, timely object to the verdicts on the basis that they were "inconsistent" and contrary to law. This objection was made immediately after the judge read the verdicts into the record and, again, in its post-trial motion. While the lawyer objected on the basis that the verdicts were "inconsistent," it is apparent from the arguments made at that time that the lawyer objected on the basis that the verdicts were "contrary to law" pursuant to Civ.R. 59(A) (7) rather than "inconsistent" with the general verdict under Civ.R. 49(B), which requires a different standard of review.[4] We conclude that, under these circumstances, McMahan Wrecking properly preserved this assignment of error for our review.
Regardless of our conclusion that the verdicts are contrary to law, we need not remand this matter for a new trial on the single issue of respondeat superior liability as McMahan's Wrecking also asserts, and we conclude, that Baeppler failed to present sufficient evidence to support his prima facie case. As noted above, Baeppler rested the sole basis for such liability upon the fact that McMahan's wife, the corporate president, typed the defamatory letter. To satisfy his burden of proof, Baeppler had to initially show that McMahan dictated and Deborah typed the letter within the scope of employment. Byrd, 57 Ohio St.3d at 59. Finally, because defamation is an intentional tort, Baeppler also needed to show that the letter was calculated to facilitate or promote the business. Id. The evidence produced in support of both aspects of the prima facie case cannot be said to be substantial competent evidence such that reasonable minds might reach different conclusions. Ramage, 64 Ohio St.3d at 109. Rather, reasonable minds could reach only one conclusion with regard to the respondeat superior claim and that conclusion is adverse to Baeppler. Civ.R. 50 (A) (4); see Texler,81 Ohio St.3d at 679. Therefore, the judge should have granted McMahan Wrecking's motion for judgment notwithstanding the verdict.
In conclusion, the second assignment of error is well taken and we vacate the judgment against McMahan Wrecking.
 No. 76042
In their appeal from the award of attorney fees, McMahan and McMahan Wrecking assert three assignments of error. Because we find the second assignment of error dispositive of this appeal, we do not address the first and third assignments of error.[5] App.R. 12 (A) (1) (c). The second assignment of error states as follows:
 AS THE PLAINTIFF FAILED TO PRESENT ANY EVIDENCE WITH REGARD TO ATTORNEY'S FEES AT THE TRIAL OF THIS MATTER, HIS POST-TRIAL MOTION TO TAX ATTORNEY'S FEES WAS UNTIMELY AND SHOULD HAVE BEEN DENIED
McMahan and McMahan Wrecking argue that the question whether a party is entitled to attorney fees is a question for the jury to decide. They assert, although in his complaint Baeppler requested attorney fees, he failed to present the issue to the jury and is precluded from recovering such fees.
Baeppler asserts that, because there was no objection to the method used by the judge in concluding that he was entitled to attorney fees, McMahan and McMahan Wrecking are precluded from raising the issue on appeal.
In Digital Analog Design Corp. v. North Supply Co. (1992),63 Ohio St.3d 657, 590 N.E.2d 737, the Supreme Court addressed the issue of whether a litigant has the right to a trial by jury on the issue of attorney fees. The court concluded that, while there was no constitutional right to trial by jury on such an issue, id.,
paragraph two of the syllabus:
 [i]n view of the public policy of this state that favors jury determination of issues of liability, as evidenced by the General Assembly's passage of R.C. 2315.21 and its amendment to R.C. 2315.18, a trial court must submit to a jury the issue of whether attorney fees should be awarded in a tort action. The amount of those fees, however, shall be determined by the trial judge, who may, in his or her discretion, submit the question of the amount of the fees to the jury. [Id., paragraph three of the syllabus.[6]]
As this court recently pointed out in Physicians Diagnostic Imagingv. Grange Ins. Co. (Sept. 24, 1998), Cuyahoga App. No. 73088, unreported, "[Digital] leaves no room for doubt that the proper procedure is to submit the issue of entitlement to attorney fees to the jury."
As McMahan pointed out below, Baeppler did not present the question of attorney fees to the jury for its determination of liability.[7] Because the judge improperly awarded attorney fees in his favor, the second assignment of error is well taken. We vacate the order granting attorney fees in Baeppler's favor.
Based upon the foregoing, in Case Nos. 74938 and 75131, we affirm that portion of the judgment against McMahan and vacate that portion of the judgment against McMahan's Wrecking. With regard to Case No. 76042, we vacate the judgment and order awarding Baeppler his attorney's fees.
It is ordered that the parties share equally the costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _______________________ ANNE L. KILBANE, JUDGE
 JAMES D. SWEENEY. J.. CONCURSIN JUDGMENT ONLY.
 KENNETH A. ROCCO. P.J.. DISSENTS.
[1] See "Exhibit A" Attached.
[2] The argument that the letter is protected by a qualified privilege, as it relates to the incident with Koziol, need not be addressed since proof of actual malice defeats such a claim.Jacobs v. Frank (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus.
[3] A. P. Herbert, Uncommon Law.
[4] Colvin v. Abbey's Restaurant, Inc., 85 Ohio St.3d 535,709 N.E.2d 1156, paragraph one of the syllabus ("When a jury's answers to interrogatories are inconsistent with a general verdict reached by the jury, the trial court must choose among the three options set forth in Civ.R. 49(B): (1) enter judgment in accordance with the interrogatory answers, (2) return the jury for further consideration of the interrogatories and the general verdict, or (3) order a new trial. The choice of one of the three options lies within the sound discretion of the trial court.").
[5] In their first assignment of error, they challenged the judge's jurisdiction to consider an award of attorney fees after the filing of an appeal and, in the third assignment of error, they challenged the sufficiency of the evidence to support the award.
[6] Later, in Zoppo v. Homestead Ins. Co. (1994), 71 Ohio St.3d 552,644 N.E.2d 397, paragraph two of the syllabus, the court held that R.C. 2315.21 (C) (2), which requires the court to determine the amount of punitive or exemplary damages once the jury determines liability, violates the right to trial by jury under Section 5, Article I of the Ohio Constitution. However, this conclusion does not affect the conclusion in Digital which placed the question of liability for attorney fees with the jury when the jury sits as the trier of fact. See id. at 557.
[7] In fact, when the jury put forth the question, "What are the approximate costs for legal fees in a court proceeding," the court instructed the jury without objection that, as a matter of law, it was not an item for consideration.
 EXHIBIT "A"
February 8, 1996
William Denihan, Safety Director 1825 Lakeside Avenue Cleveland, Ohio 44114
Dear Mr. Denihan:
I am writing to bring to your attention a misuse of power in the Cleveland Police Department. The misuse of power is in several areas. The first area is the Second District Police Station. Starting with Commander Gregory Bappler. Commander Bappler has a personal vendetta against me. He has misused his power against me in order to carry that out. I have many examples and witnesses to attest to that fact. I would have many more witnesses (Cleveland Police Officers themselves), except they feel possibly their jobs or standing in the force would be in jeopardy. I'm sure if you investigated this and "they" would be assured of protection from Commander Bappler's wrath, that they would tell you of all the instances he has attacked me verbally to them as well as instructed others to do the same, including actions carried out using police authority!
I have a business on the west side of Cleveland (currently in First District, not Second!), Called McMahan's Wrecking and McMahan's Auto Sales. I grew up in this area and have lived and worked in this area nearly all my life. I have a prosperous business and I feel Commander Bappler has developed this vendetta over hearsay about how I make my money. I have invited Commander Bappler as well as any other parties to come to my business anytime. I've told them they can see by books, financial statements, whatever they like. Commander Bappler and his counterparts aren't interested in learning what I'm really all about. They'd rather base their actions on false information and hearsay!
On New Year's weekend (1995 to 1996), I discovered an expensive of equipment missing form my business. It was a commuter used to test cars. Actually, I was working Sunday and Monday of that weekend, although we were closed, and I discovered the computer missing the following Tuesday (1-2-96). There were some friends and relatives in and out of the garage, also, that weekend, working on their cars, etc. I had a few suspects in mind that I knew were there. I concluded it was my own nephew who took the computer; I was wrong. One of my best friends called me a week later and told me his own brother, Ed Koziol, had stole my computer. He heard "on the street" he had tried to sell it to someone. Ed Koziol was here that weekend. Bob felt bad his own brother would steal from me and he told me because he knew I would do the same for him. Ed Koziol came to my business Monday morning (1-8-95). I told him I knew he had my computer and I wanted it back. I called him upstairs above my sales counter so we could talk. He got loud and grabbed me and I got him off of me. There was an altercation and we exchanged blows. He admitted having the computer and said it was at his girlfriends house. He made a call there and Dennis Clair, one of our employees, went to her house and picked up the computer. When I learned Dennis had got the computer back, I drove Eddie home. I called his Mom on my cellular phone to tell her what Ed had done, but I was hoarse that day and she didn't believe who I was and what had happened. These calls are on record at the cellular phone company. Ed Koziol went to the prosecutor and reported I had assaulted him for no reason and that I accused him falsely of stealing my computer. Apparently he sought medical attention and received some stitches. Dennis Clair, my employee, proceeded to file a report about the theft of my computer. EdKoziol's name has been removed from that report as a suspect! As soon as Commander Bappler heard about this felonious assault charge against me, he began to wage his private war against me! This incident did not even occur in his district!! Why was he involved?! The report on my stolen computer was totally ignored, my civil rights were violated. The word of Ed Koziol, a habitual liar, known thief and drug user, was taken over mine, a hard working citizen who brings in a lot of tax dollars into this area. I could elaborate more on this story, but I'll stop here and go on with another story about Commander Bappler.
There was a man named Tim Stewart who was arrested and in Second District jail. He was facing two DWI charges as well as a domestic violence charge. I'm not sure of the dates, but Tim Stewart will verify this for you if necessary. Tim Stewart is adrywall man. Commander Bappler needed some drywall work done in his house; he asked Tim Stewart (while he was in jail), if he would be interested in doing the work he needed. When Tim Stewart agreed to do the work, Commander Bappler stated he would see what he could do to help Tim with these serious charges he was facing. Wouldn't you know it, all of Tim Stewart's paperwork somehow got lost! Tim was released from jail and never had to face any of these charges; and of course, Commander Bappler got his drywall work for free!
I have friends who are police officers, other friends and acquaintances and family members who can all attest to what I have told you in this letter. I called M.A.D.D. regarding the Tim Stewart story. They are the ones who told me to write to you. They told me you were not employed by the police and you would be unbiased in this matter (not influenced by police pressure). I hope that will be the case. I am planning to file civil lawsuits against Commander Bappler — 2nd District, Commander Ricchetti — 1st District, Detective Sweeney and Detective Sandoval — 1st District, and Chuck Escalante — 2nd District and there are more to come to add to this list. I hope you will do your civic duty and investigate these allegations to your best ability. Feel free to stop and see me or call me anytime at McMahan's Wrecking, 3378 West 65th Street, Cleveland, Ohio, 44102 (216) 961-8500.
Sincerely,
Don McMahan
DM/pp
cc: City of Cleveland, Complaint Department Mayor Michael White Attorney Tim Potts Paul Orlosky, Channel 3 News
 CONCURRING OPINION