[Cite as *Carnahan v. Morton Bldgs., Inc.*, 2014-Ohio-4139.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### PAULDING COUNTY

SAMUEL N. CARNAHAN,

      PLAINTIFF-APPELLANT,                 CASE NO. 11-14-02

      v.

MORTON BUILDINGS, INC., ET AL.,          O P I N I O N

      DEFENDANTS-APPELLEES.


Appeal from Paulding County Common Pleas Court

Trial Court No. CI-12-0242

**Judgment Affirmed**

Date of Decision:   September 22, 2014


APPEARANCES:

    *Shawn M. Wollam* **for Appellant**

    *Tracey S. McGurk* **for Appellee, Morton Bldg., Inc.**

    *Carolyn S. Bowe* **for Appellee, Ohio B.W.C.**

**PRESTON, J.**

{**¶1**} Plaintiff-appellant, Samuel N. Carnahan ("Carnahan"), appeals the March 18, 2014 judgment entry of the Paulding County Court of Common Pleas. Carnahan argues that the trial court erred in granting summary judgment in favor of defendants-appellees, Morton Buildings, Inc. ("Morton") and the Ohio Bureau of Workers' Compensation ("BWC") (collectively "defendants"), on his workers' compensation claim. For the reasons that follow, we affirm.

{**¶2**} Carnahan was injured in an all-terrain vehicle ("ATV") accident on August 24, 2011. (Carnahan Depo, Doc. No. 11 at 38). Carnahan's injury occurred on a 100-acre property located in Augusta, Missouri, at which Carnahan was constructing a pole barn for his employer, Morton. (*Id.*).

{**¶3**} Carnahan began his employment with Morton in May 2008. (*Id.* at 8). Carnahan worked as a crew leadman until he was promoted to a crew foreman in March or April 2010. (*Id.* at 12). Carnahan received his assignments from Morton's Paulding, Ohio sales manager, Jeff Dawson, and reported to area crew supervisor, Doug Weinman ("Weinman"). (*Id.* at 12, 15). As a crew foreman, Carnahan was paid on an hourly basis and responsible for managing his and his crew's timesheets. (*Id.* at 16). In addition, he was responsible for reviewing blueprints with customers to ensure they reflected the customers' requests. (*Id.* at 14). Because Morton maintained a separate sales department that was responsible

for soliciting new business, Carnahan was not required or authorized to entertain or solicit any current or potential clients. (Weinman Aff., Doc. No. 10, Ex. 3).

{¶4} In August 2011, Carnahan, along with two crew members, Chad Breedlove and Trent Wooden, was assigned to travel to Augusta, Missouri for three weeks to construct a 42-foot by 90-foot pole barn. (Carnahan Depo., Doc. No. 11 at 18-20, 23). The pole barn was to be constructed on the 100-acre property owned by Bill Holcamp ("Holcamp"). (*Id.* at 35).

{¶5} When Carnahan arrived in Missouri, he went to the jobsite and met with Chad Cox ("Cox"), a salesman with Morton's sales office in Mexico, Missouri. (*Id.* at 16, 20). Cox provided Carnahan the job packet and information for the hotel that Cox reserved for the crew. (*Id.* at 20). While reviewing the blueprints for the project, Cox asked the crew, "I just ask you guys to do a good job, do me a good job building this building, you know, so the customer stays happy because * * * I have a possibility of some return business with this guy, a couple more buildings possibly." (*Id.* at 21).

{¶6} Cox introduced the crew to Buck Parsons ("Parsons"), the farm manager Holcamp employed to assist in the management of the property. (*Id.*). Holcamp also employed a farmhand, Bob Stevens ("Stevens"), who reported to Parsons. (*Id.* at 27). After meeting Parsons, Carnahan discussed the plans for the pole barn with him. (*Id.* at 20). Carnahan spoke with Parsons or Stevens daily

regarding the progress of the pole barn. (*Id.* at 26). Carnahan met with Holcamp on only one occasion during the construction of the pole barn. (*Id.* at 27). On that occasion, Carnahan asked Holcamp if the pole barn construction was to his satisfaction, to which he responded that it was. (*Id.*).

{¶7} The crew reported to the jobsite at 6:30 a.m. each workday and, at the end of each workday, they immediately left the site and returned to the hotel. (*Id.* at 22-23); (Weinman Aff., Doc. No. 10, Ex. 3). Carnahan indicated that the crew typically finished working between 4:30 and 5:00 p.m. (Carnahan Depo., Doc. No. 11 at 23). During the project, Carnahan contacted Cox weekly to arrange times for him to collect meal money for himself and his crew. (*Id.* at 24). Carnahan also contacted Cox during the second week of the project to request some trim pieces that he noticed were missing. (*Id.*). Carnahan expected Cox to deliver the missing trim pieces between the afternoon of August 24, 2011 and the morning of August 25, 2011. (*Id.* at 25). The crew was to return to Ohio on August 25, 2011 irrespective of whether Cox delivered the missing trim pieces.[1] (*Id.* at 29-31).

{¶8} Stevens mentioned multiple times to the crew during the last week of construction about taking a tour of the property. (*Id.* at 32). Specifically, on August 24, 2011, Stevens inquired during their lunch break if Carnahan and his

---

[1] The parties confirmed at oral argument that the crew was to return to Ohio regardless of whether the missing trim pieces were delivered.

crew were interested in the tour, and again when the crew was finishing cleaning up the worksite at approximately 4:30 to 5:00 p.m. (*Id.* at 33). When Stevens inquired about the tour at the time of the crew's lunch break, the crew told him that "we'll see how things go for the day." (*Id.* at 33). When Stevens again inquired about the tour, Carnahan was "doing [his] final walk around looking at the building * * * [to] make sure [they] didn't miss any screws, [to] make sure all the trim on the exterior [was] secured properly and nothing [was] missing" because the construction was complete, except for the missing trim pieces. (*Id.* at 30-31, 34). At that time, all of their equipment was loaded on the truck, but Carnahan needed to "double-check" the trailer to make sure the equipment was properly secured. (*Id.* at 34). Carnahan intended to "double-check" the trailer "later on." (*Id.*).

{¶9} The crew agreed to the tour and followed Stevens, each on his own ATV provided by Stevens. (*Id.* at 34, 35). Carnahan testified that the crew was interested in the tour "because [they] had heard so much about [the property]" from Parsons and Stevens. (*Id.* at 32). Neither Parsons nor Holcamp were present when the crew agreed to go with Stevens on the tour; however, Stevens received permission for the tour from Parsons, who received his permission from Holcamp. (*Id.* at 32, 35). Likewise, neither Parsons nor Holcamp invited the crew on the tour, just Stevens. (*Id.* at 32). According to Cox and Weinman, Carnahan did not

inform anyone at Morton about the tour, or gain permission from anyone at Morton to take the tour. (Cox Aff., Doc. No. 10, Ex. 2); (Weinman Aff., Doc. No. 10, Ex. 3).

{¶10} The crew followed Stevens down a trail to a pavilion being constructed by another company near the property's 93-acre lake. (Carnahan Depo., Doc. No. 11 at 36). After seeing the pavilion, the group proceeded around the lake, and stopped at a cove, and a concrete dam. (*Id.*). At the dam, Stevens explained to the crew that Holcamp was considering some locations for the construction of a residential house and boathouse, and Stevens showed the crew the locations being considered. (*Id.*). Carnahan assumed the boathouse was one of the buildings Cox referred to when he indicated there was a possibility of future work for Morton on the property. (*Id.* at 39).

{¶11} At this time, the group had been riding the ATVs for approximately 30 minutes. (*Id.* at 37). After pointing out the locations for the residential house and boathouse, Stevens explained that they had to follow a trail up to a certain point and turn around to return to the construction site. (*Id.*). Carnahan testified that he then "took off" and headed up the trail described by Stevens. (*Id.*). Carnahan lost control of his ATV as he was heading up the trail. (*Id.* at 38). As a result of the ATV accident, Carnahan spent seven weeks in the hospital after

sustaining severe head trauma and a laceration to the right side of his head. (*Id.* at 39).

{¶12} Carnahan filed a First Report of an Injury, Occupational Disease or Death ("FROI-1") on April 24, 2012. (*See* Doc. No. 1). Morton, a self-insured employer, contested Carnahan's workers' compensation claim. (Doc. No. 2). As a result, Carnahan's claim was referred to the Industrial Commission for review. Thereafter, Carnahan's FROI-1 was denied by a district hearing officer ("DHO") for the Industrial Commission on July 7, 2012. (Doc. No. 1). Carnahan appealed the DHO's decision on July 27, 2012. (*Id.*). On September 6, 2012, a staff hearing officer ("SHO") for the Industrial Commission denied Carnahan's FROI-1 and disallowed his claim in its entirety. (*Id.*). Carnahan appealed the SHO's decision to the Industrial Commission on September 11, 2012, but the Industrial Commission issued an order on September 27, 2012 refusing to hear Carnahan's appeal. (*Id.*).

{¶13} On November 26, 2012, Carnahan appealed the matter to the Paulding County Court of Common Pleas. (*Id.*). As part of the discovery process, Morton deposed Carnahan on June 27, 2013. (Carnahan Depo., Doc. No. 11).

{¶14} On September 26, 2013, Morton filed a motion for summary judgment, arguing that Carnahan's injury did not occur in the course of, and arise out of, his employment with Morton and was therefore not a valid workers'

compensation claim. (Doc. No. 10). In support of its motion, Morton attached Carnahan's deposition and affidavits of Cox and Weinman. (*Id.*) On October 25, 2013, Carnahan filed a memorandum in opposition to Morton's motion for summary judgment. (Doc. No. 14). Carnahan argued that genuine issues of material fact remained in dispute regarding the possibility of future work for Morton on the property, Carnahan's role as Morton's crew foreman, and whether Carnahan had completed his work for the day on August 24, 2011. (*Id.* at 7). On November 7, 2013, Morton filed a reply to Carnahan's memorandum in opposition to summary judgment. (Doc. No. 15).

{¶15} On January 10, 2014, the trial court issued a judgment entry granting summary judgment in favor of Morton. (Jan. 10, 2014 JE, Doc. No. 16). Carnahan filed his notice of appeal on February 3, 2014. (Doc. No. 17).

{¶16} On February 12, 2014, we dismissed Carnahan's appeal after concluding that we did not yet have jurisdiction to hear the matter. (Feb. 12, 2014 JE). We determined that the January 10, 2014 judgment entry was not a "final order" pursuant to R.C. 2505.02 because the judgment reflected a summary-judgment ruling in favor of only one defendant. (*Id.*).

{¶17} As a result, the BWC filed a motion for leave to file a motion for summary judgment instanter on February 24, 2014, to which it attached its motion for summary judgment. (Doc. Nos. 20, 21). The trial court granted the BWC's

motion for leave to file a motion for summary judgment instanter on February 26, 2014. (Feb. 26, 2014 JE, Doc. No. 22).[2] On March, 18, 2014, the trial court granted the BWC's motion for summary judgment. (Mar. 18, 2014 JE, Doc. No. 23).

{¶18} Carnahan filed his notice of appeal on April 15, 2014. (Doc. No. 24). Subsequent to Carnahan's appeal, the trial court issued a nunc pro tunc order on April 23, 2014 clarifying that it granted the BWC's motion for summary judgment, dismissed Carnahan's claim, and prohibited him from participating in the workers' compensation fund. (Apr. 23, 2014 JE).

{¶19} Carnahan raises one assignment of error for our review.

### Assignment of Error

**The trial court erred by determining there were no genuine issues of material fact and that defendants were entitled to judgment as a matter of law on the issue of whether plaintiff-appellant was injured in the course of and arising out of his employment.**

{¶20} In his first assignment of error, Carnahan argues that the trial court erred in finding that the defendants were entitled to judgment as a matter of law on the issues of whether he was injured in the course of, and arising out of, his employment with Morton. Specifically, Carnahan argues that genuine issues of material fact remain in dispute—namely, the possibility of future work for Morton

---

[2] We note that the BWC's motion for summary judgment was recorded as filed on February 24, 2014, which was prior to the trial court's judgment entry granting the BWC's motion for leave to file a motion for summary judgment instanter.

at the Holcamp property, Carnahan's role as Morton's crew foreman on an out-of-state project, and whether Carnahan had completed his work on August 24, 2011 at the time of the accident. In the alternative, Carnahan argues that even if material facts are not in dispute, certain inferences can be made that he was in the course of his employment when the injury occurred, and that his injury arose out of his employment.

{¶21} We review a summary-judgment ruling of a court of common pleas from an appeal of a decision by the Industrial Commission using the same standard of review for any other summary-judgment ruling—that is, de novo. *Buck v. Melco, Inc.*, 185 Ohio App.3d 281, 2009-Ohio-6872, ¶ 8 (3d Dist.), citing *Conley-Slowinski v. Superior Spinning & Stamping Co.*, 128 Ohio App.3d 360, 363 (6th Dist.1998). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

{¶22} "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"

(Emphasis sic.) *Forest Hills Local School Dist. Bd. of Edn. v. Huegel*, 12th Dist. Clermont No. CA2002-07-050, 2003-Ohio-3444, ¶ 14, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "Whether a genuine issue exists is answered by the following inquiry: Does the evidence present 'a sufficient disagreement to require submission to a jury' or is it 'so one-sided that one party must prevail as a matter of law[?]'" *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), citing *Anderson* at 251-252. Material facts are those facts "that might affect the outcome of the suit under the governing law." *Id.*, citing *Anderson* at 248.

{¶23} Summary judgment should be granted with caution, resolving all doubts in favor of the nonmoving party. *Perez v. Scripts-Howard Broadcasting Co.*, 35 Ohio St.3d 215, 217 (1988). "The purpose of summary judgment is not to try issues of fact, but is rather to determine whether triable issues of fact exist." *Lakota Local School Dist. Bd. of Edn. v. Brickner*, 108 Ohio App.3d 637, 643 (6th Dist.1996). In ruling on a motion for summary judgment, a court is not permitted to weigh evidence or choose among reasonable inferences; rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the nonmoving party. *Buck* at ¶ 10, citing *Jacobs v. Racevskis*, 105 Ohio App.3d 1, 7 (2d Dist.1995).

{¶24} A compensable injury under the Workers' Compensation Act is:

> \* \* \* any injury, whether caused by external accidental means or
> accidental in character and result, received in the course of, and
> arising out of, the injured employee's employment.

R.C. 4123.01(C). Thus, to be a compensable injury, it must occur "in the course of" *and* "aris[e] out of" the injured worker's employment. R.C. 4123.01(C); *Bralley v. Daugherty*, 61 Ohio St.2d 302, 303 (1980). The Supreme Court of Ohio has expressly recognized that this test is conjunctive in nature, requiring each prong to be satisfied before compensation is allowed. *Fisher v. Mayfield*, 49 Ohio St.3d 275, 277 (1990). As a general rule, the workers' compensation statute must be liberally construed in favor of the injured worker; nevertheless, the injured worker bears the burden to prove both prongs of this two-prong formula. R.C. 4123.95; *Fisher* at 278.

{¶25} The second prong of the statutory formula requires that an injury arise out of the injured worker's employment. This inquiry refers to a sufficient causal connection between the employment and the injury. *Fisher* at 277. "Whether there is a sufficient 'causal connection' between an employee's injury and his employment to justify the right to participate in the Workers' Compensation Fund depends on the totality of the facts and circumstances surrounding the accident, including the (1) proximity of the scene of the accident to the place of employment; (2) the degree of control the employer had over the

scene of the accident; and (3) the benefit the employer received from the injured employee's presence at the scene of the accident." *Lord v. Daugherty*, 66 Ohio St.2d 441 (1981), syllabus. The *Lord* factors are not exhaustive; rather, the factors "are merely illustrative of the facts to be considered under the totality of the circumstances." *Griffith v. Miamisburg*, 10th Dist. Franklin No. 08AP-557, 2008-Ohio-6611, ¶ 10, citing *Fisher* at 279, fn. 2.

{¶26} "These guiding principles, while construed liberally in favor of the employee, must nevertheless be measured against the purpose of Ohio's Workers' Compensation Act." *Keating v. Classic East, Inc.*, 11th Dist. Lake No. 2008-L-001, 2008-Ohio-3740, ¶ 17. "The purpose of the Workers' Compensation Act is not to make an employer an absolute insurer of the employee's safety, but only to protect the employee against risks and hazards incident to the performance of his work." *Phelps v. Positive Action Tool Co.*, 26 Ohio St.3d 142, 144 (1986).

{¶27} Because it is dispositive, we first address whether Carnahan's injury arose out of his employment with Morton. Application of the *Lord* factors to the facts viewed in Carnahan's favor demonstrates that, as a matter of law, Carnahan's injury did not arise out of his employment. Considering Carnahan's employment with Morton, there are no *genuine* issues of *material* fact regarding the possibility of future work for Morton at the Holcamp property, Carnahan's role as Morton's crew foreman on an out-of-state project, or whether Carnahan had finished his

-13-

work on the day of the accident. Likewise, there are no inferences that can be made that Carnahan's injury arose out of his employment.

**{¶28}** The scene of the accident was not in proximity to Carnahan's last place of employment. As we have previously said, when an injured worker is away from his "home base," the injured worker's place of employment is his or her last place of employment. *Elsass v. Commercial Carriers, Inc.*, 73 Ohio App.3d 112, 115 (3d Dist.1992). Carnahan's "home base" was Morton's Paulding, Ohio office. Despite that, Morton assigned Carnahan to travel to Missouri to construct a pole barn. Hence, we agree that Carnahan's last place of employment at the time of the accident was the pole-barn jobsite.

**{¶29}** We disagree, however, with Carnahan's argument that the facts establish that the scene of the accident was in the proximity of his last place of employment. In support of his argument, Carnahan relies on *Faber v. R.J. Frazier Co.*, 72 Ohio App.3d 9, 13-14, 15 (11th Dist.1991) and *Griffith*, 2008-Ohio-661, at ¶ 28-30. Carnahan relies on *Faber* to argue that "an employee who is injured off-site yet still in the 'zone of employment' is eligible for benefits even where his employer does not own, maintain, or control the property at issue." (*See* Appellant's Brief at 15). Carnahan's argument is erroneous for two reasons. First, the "zone of employment" rule is an exception to the "coming-and-going" rule, which acts as a bar to compensation for certain employees who are traveling to or

from work. *See Tucker v. Michael's Store, Inc.*, 3d Dist. Allen No. 1-02-94, 2003-Ohio-1538, ¶ 8. Because Carnahan was not traveling to or from the hotel to the pole-barn jobsite, we need not address the coming-and-going rule or any of its exceptions. Second, the Eleventh District Court of Appeals concluded that, even though Faber's employer did not own the property at which he worked, his injury was compensable because it occurred on the employment premises. *Faber* at *15. Accordingly, the Eleventh District's conclusion was not based on a "zone-of-employment" analysis. *See id.*

{¶30} Relying on *Griffith*, Carnahan urges us to find that his injury was in the proximity of his last place of employment because his injury occurred on Morton's customer's property. In *Griffith*, the Tenth District Court of Appeals determined that Griffith's injury occurred in the proximity of his last place of employment because it occurred on the grounds of the training academy where his employer authorized him to be. *Id.* at ¶ 30. The facts of *Griffith* are distinguishable from the facts presented by this case. Griffith was authorized by his employer to use the full space of the training academy. *Id.* at ¶ 14, 19. In fact, Griffith was encouraged to remain on the premises of the training academy and use its amenities during his free time. *Id.* at ¶ 25. Here, Morton authorized Carnahan to go only to the pole-barn jobsite and instructed him to immediately return to the hotel at the end of each workday. (Carnahan Depo., Doc. No. 11 at

18, 20, 23); (Weinman Aff., Doc. No. 10, Ex. 3). Carnahan was not authorized to be on any other portion of the property since there were no other construction projects on the property being conducted by Morton, and Carnahan had no job duties away from the pole-barn jobsite. (Cox Aff., Doc. No. 10, Ex. 2); (Weinman Aff., Doc. No. 10, Ex. 3). Unlike the defendant in *Griffith*, Carnahan was not injured in the area in which he was authorized to be; rather, Carnahan was injured while riding an ATV, approximately one mile, or 30 minutes, from the pole-barn jobsite.

{¶31} "Proximity" is "[t]he quality or state of being near in time, place, order, or relation." *Black's Law Dictionary* 1421 (10th Ed.2014). Carnahan's accident was not in the proximity of his last place of employment because it was not near in time, place, or purpose to Carnahan's last place of employment—the pole-barn jobsite. *See Elsass*, 73 Ohio App.3d at 115 (finding that the accident was too far removed in time, space, and purpose from the injured worker's last place of employment). Instead, the injury occurred well beyond the designated area where Carnahan performed his regular duties. *See Lord*, 66 Ohio St.2d at 444 (finding the proximity of the scene to the area of employment was remote because the accident occurred three miles from the designated area where the decedent performed his regular duties); *Stivison v. Goodyear Tire & Rubber Co.*, 80 Ohio St.3d 498, 499 (1997) (finding the place of injury was not in the proximity of the

employer's plant because the injury occurred at a restaurant approximately one mile from the plant); *Bralley*, 61 Ohio St.2d at 305 (finding the scene of the accident was not "immediately adjacent" to the injured worker's place of employment because it occurred over one-third of a mile from the employer's plant).

{¶32} Next, Morton did not have control over the scene of the accident. Carnahan argues that, while Morton did not have actual control over the scene of the accident, Morton did exercise a certain degree of control over the incident because Morton instructed Carnahan to go to the property and to "do a good job" and "keep the customer happy."

{¶33} Carnahan's argument is erroneous. "The proper scrutiny entails the amount of control the employer had over *the situs of the injury*, and not the degree of control the employer had regarding the actions of its employees." (Emphasis added.) *Fisher*, 49 Ohio St.3d at 279. The nature of the construction business, as here, often requires that the work be performed on a customer's premises. Carnahan was assigned to an out-of-state construction site to construct a pole barn on Morton's customer's property. While Morton may have exhibited a certain degree of control over the pole-barn jobsite, it did not exercise any control over the property outside of the jobsite. *See Ruckman v. Cubby Drilling, Inc.*, 81 Ohio St.3d 117, 121 (1998) ("The employer exercised no control over the public

roadways upon which the accidents occurred."); *Bralley*, 61 Ohio St.2d at 304 ("The employer had no control over the asphalt road or the railroad crossing where the accident occurred."). Likewise, Morton did not exercise any control over Stevens or the ATVs provided to the crew for the farm tour by Stevens. *See MTD Products, Inc. v. Robatin*, 61 Ohio St.3d 66 (1991) (finding the employer had no control over the negligent driver who caused the accident); *Williams v. Martin Marietta Energy Sys., Inc.*, 99 Ohio App.3d 520, 527 (4th Dist.1994) (finding the injury received by an employee giving blood during a blood drive on the employer's premises during work hours was not compensable because the employer had no control over the manner in which the blood was withdrawn from employees). Therefore, Morton had no control over the scene of the accident— that is, the accident occurred outside of the jobsite and Morton had no control over the trail where the accident occurred, Stevens, or the ATVs. *See Lord*, 66 Ohio St.2d at 444 (finding the employer had no control over the scene of the accident because it occurred completely out of the decedent's designated area and the employer had no knowledge or explanation for decedent's presence there); *Serraino v. Fauster-Cameron, Inc.*, 3d Dist. Defiance No. 4-12-11, 2013-Ohio-329, ¶ 26 (finding the employer had no control over catering company that served its employees on its premises).

**{¶34}** Third, Carnahan's participation in the ATV ride, and, consequently, his presence at the scene of the accident, provided no benefit to Morton because it was outside of the scope of his employment and not a job duty he was required to perform. In fact, Carnahan did not indicate that he wanted to take the tour because he thought it was part of his job duties as a crew foreman for Morton; rather, he testified that he wanted to take the tour because he had heard so much about the property from Parsons and Stevens. (Carnahan Depo., Doc. No. 11 at 32). Nevertheless, Carnahan argues that his participation in the tour benefitted Morton because, as the foreman on an out-of-state project, he was fostering a relationship and building goodwill with Morton's customer's agents. Further, Carnahan argues that he was benefitting Morton by participating in the tour because he was scouting locations for the future work to which Cox alluded.

**{¶35}** Again, Carnahan was instructed to go to Missouri to construct a pole barn. (Carnahan Depo., Doc. No. 11 at 18). Carnahan, who was paid hourly, was instructed to report to the pole-barn jobsite to begin work at 6:30 a.m., finish work at approximately 4:30 p.m., and immediately return to the hotel once he finished work for the day. (*Id.* at 16, 22-23); (Weinman Aff., Doc. No. 10, Ex. 3). Carnahan's duties as crew foreman included maintaining the timesheets for himself and his crew, reviewing project blueprints, and ensuring the construction project conformed with the project's blueprints and the customer's expectations.

(Carnahan Depo., Doc. No. 11 at 14, 16). None of Carnahan's job duties included taking ATV rides to foster relationships or goodwill or to scout locations for future work. Also, Morton did not tell Carnahan what, or where, its future projects might be.

{¶36} Likewise, no inference can be drawn from Morton's instruction to Carnahan to "do a good job" and "keep the customer happy." Morton's instruction to Carnahan was clear—go to Missouri and "do a good job" constructing the pole barn so that the customer is "happy" with the quality of the work product. Carnahan was not required or authorized to entertain or solicit any current or potential clients. (Weinman Aff., Doc. No. 10, Ex. 3). Morton had no business or other responsibilities near the scene of the accident, was not aware that the crew was requested to take the tour, and did not authorize the crew to take the tour. (*Id.*); (Cox Aff., Doc. No. 10, Ex. 2). *See also Lord*, 66 Ohio St.2d at 445 (finding the employer did not receive any benefit from the decedent being at the scene of the accident because the employer did not have any business or other responsibilities at the scene and the employer did not authorize him to be at the scene). Instead, Morton instructed the crew to immediately leave the jobsite when they finished work for the day. (Weinman Aff., Doc. No. 10, Ex. 3). Thus, taking the tour was not within the scope of Carnahan's job duties or instructions provided to him by Morton. Therefore, whether Carnahan had completed work on August

24, 2011 is not a *material* fact, and there are no *genuine* issues of material fact regarding his role as Morton's crew foreman on an out-of-state project or regarding Morton's possibility of future work on the Holcamp property.

**{¶37}** Moreover, neither the property's owner nor the farm manager invited the crew on the tour; rather, it was the farmhand that invited the crew. (Doc. No. 10, Ex. 1 at 32-33). On the tour, Stevens merely pointed out to the crew where Holcamp was purportedly considering constructing a residential house and a boathouse. (*Id.* at 36). There is no evidence in the record that any potential business was discussed on the trip, and even if there was, there is no evidence that Stevens, as the farmhand, had the authority to conduct business transactions for construction on the property. *See Callahan v. Proctor & Gamble Co.*, 3d Dist. Allen No. 1-08-19, 2008-Ohio-4954, ¶ 34 (finding the fact that business may have been briefly discussed did not give rise to any genuine issue as to whether the injured worker was within the scope of her employment for the benefit of her employment under the *Lord* test). As a result, there is no evidence that Morton received a benefit from Carnahan's presence at the scene of the accident.

**{¶38}** There are no other facts or circumstances that demonstrate that Carnahan's injury arose out of his employment with Morton.

**{¶39}** Thus, upon review of the totality of the circumstances, we find that there is no *genuine* issue of *material* fact in dispute that Carnahan's injury arose

out of his employment with Morton. Accordingly, it is not necessary to consider whether his injury was suffered in the course of his employment because both must be established before an employee may participate in the workers' compensation fund. *Serraino*, 2013-Ohio-329, at ¶ 33, citing *Fisher*, 49 Ohio St.3d at 277. Therefore, we need not address Carnahan's arguments regarding whether he was injured in the course of his employment.

**{¶40}** Carnahan's assignment of error is overruled.

**{¶41}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**